UNITED STATES of America, Plaintiff-Appellee,

v.

Christopher SUMMERS, a.k.a. Christopher Summers, Defendant-Appellant.

Nos. 98-2010, 98-2012 and 98-2013.

United States Court of Appeals,

Eleventh Circuit.

May 26, 1999.

Appeals from the United States District Court for the Northern District of Florida. (Nos. 3:97cr81/RV, 3:97cr92/RV, 3:97cr103/RV, Roger Vinson, Judge.

Before EDMONDSON and CARNES, Circuit Judges, and WATSON[*], Senior Judge.

WATSON, Senior Judge:

Defendant-Appellant Christopher Summers challenges the two-level increase in his offense level determination made by the sentencing judge for making a "threat of death" during a bank robbery.

Because we find that the amended Sentencing Guideline applied to Summers increased his punishment over that provided at the time of his crime, we hold that it was applied to him in violation of the *Ex Post Facto* clause of the United States Constitution. We therefore vacate the sentence and remand for re-sentencing.

The sole issue presented here is whether a two-level sentence enhancement for making a "threat of death" during a bank robbery violated the constitutional prohibition against ex post facto laws.[1] We review

---

[*]Honorable James L. Watson, Senior U.S. Judge, Court of International Trade, sitting by designation.

[1]The disputed two-level increase was the only one that affected the guideline sentencing range in the sentencing of the defendant for a total of seven bank robberies. The challenged increase was done in sentencing on Count 3 of CR81-001, which, because it had an undisputed enhancement for obstruction of justice, was the count with the highest adjusted offense level and therefore, by operation of the multiple counts procedure of U.S.S.G. § 3D1.4, had five levels added to it, causing it to reach level 31 before being reduced by three points down to 28 for acceptance of responsibility. Without the disputed enhancement, no count would have had an adjusted offense level higher than 24. The multiple counts addition of five levels pursuant to U.S.S.G. § 3D1.4 would have then resulted in a maximum level of 29 and the 3-point reduction for acceptance of responsibility would have produced a total offense level of 26, a result 2 points lower than the one reached at sentencing.

questions of the application of the law to the facts in sentencing *de novo*. *United States v. Burton,* 933 F.2d 916, 917 (11th Cir.1991) (per curiam).

## I. BACKGROUND

The sequence of events and the circumstances giving rise to this issue are as follows: On June 20, 1997 Summers robbed the First National Bank and Trust in Santa Rosa Beach, Florida, using a note that said "I've got a gun, give me $500." At the time of that robbery, the 1995 version of the United States Sentencing Guidelines (U.S.S.G.) in § 2B3.1(b)(2)(F) provided for an increase of two levels "if an express threat of death was made...." As of the time of that robbery this Court had twice held that "[t]he statement, 'I have a gun' is not a[n] express threat of death within the context of [s]ection 2B3.1(b)(2)( [F] )...." *United States v. Canzater,* 994 F.2d 773, 775 (11th Cir.1993) (per curiam); *United States v. Moore* 6 F.3d 715, 722 (11th Cir.1993).

After the robbery the Sentencing Commission, effective November 1, 1997, amended the guideline under discussion by deleting the word "express". U.S.S.G.App. C., amend. 552 (November, 1997) Amendment 552 added commentary to the effect that "the defendant does not have to state expressly his intent to kill the victim in order for the enhancement to apply."[2]

On December 18, 1997 the defendant was sentenced under the amended guideline, with the sentencing judge treating the amendment as a "clarification" of the previous guideline, finding that defendant had made a threat of death when he said "I've got a gun, give me $500" and adding two levels to the offense-level determination for the Santa Rosa Beach bank robbery. (R6-9).[3]

---

[2]The Sentencing Commission stated that the "amendment addresses a circuit court conflict regarding the application of the 'express threat of death enhancement ...' and further explained that the amendment 'adopts the majority appellate view which holds that the enhancement applies when the combination of the defendant's actions and words would instill in a reasonable person in the position of the immediate victim (e.g., a bank teller) a greater amount of fear than necessary to commit the robbery.' "

[3]At one point (R7) the sentencing judge opined that, even if he were to use the earlier guidelines, he would still be obliged to apply the "clarifying amendment." In either event, the reasoning of this opinion is unaffected.

II. DISCUSSION

It is the general rule that a defendant is sentenced under the Sentencing Guidelines in effect on the date of sentencing unless doing so would violate the *ex post facto* clause of the United States Constitution. *United States v. Bailey,* 123 F.3d 1381, 1403 (11th Cir.1997).  The primary consideration in finding an *ex post facto* violation is whether punitive enactments have failed to give individuals fair warning of their effect. *Weaver v. Graham,* 450 U.S. 24, 28—31, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981).

The starting point of our analysis is the apparent effect on the defendant of the amendment to the Sentencing Guidelines.  At the time of the bank robbery in question Summers was on notice, so to speak, that saying "I have a gun" in the course of robbing a bank in the 11th Circuit did not amount to making an "express threat of death" and therefore would not increase his punishment.  That understanding could be overcome in two ways;  the Supreme Court could have ruled that, contrary to the holdings of this court, saying "I have a gun" was an "express threat of death" or the Sentencing Commission could have clarified its Guideline in a way that gave it a retroactive effect despite this court's prior holdings.[4]

If, after Summers' bank robbery and before his sentencing, the Supreme Court had held that "I have a gun" is an express threat of death under the Guidelines there would have been no *ex post facto* objections available to Summers.  The decision of the Supreme Court would unquestionably be a "clarification" that, from the very beginning, the language of "express threat" included "I have a gun."  In effect, the Supreme Court would be saying that judges and bank robbers were indeed on notice as to that meaning at the time of the robbery.  Any contrary understanding would have been illusory or mistaken.

The same cannot be said of what the Sentencing Commission did here, primarily because it had to change the language of the original guideline in order to accomplish its amendment.[5]  At the very least, what

---

[4]This circuit could also have repudiated its earlier holdings in which case the effect would have been the same as that of a contrary Supreme Court ruling.

[5]Had it left the language of the guideline alone and merely commented in one way or another that "the 11th Circuit is wrong," we would be facing a different problem.  We would then have to decide between acceding

**3**

that change must mean is that, within this circuit, the word "express" somehow prevented Summers from receiving a fair warning that saying "I have a gun" in the course of a bank robbery was punishable as an "express threat of death." In other words, in contrast to what the Supreme Court might have done, the action of the Sentencing Commission did not necessarily speak to what the meaning of the guideline was at the time of the bank robbery because it had to change the language of the Guideline in order to express its intention clearly.

Amendment 552 was not merely an explanation or interpretation of the old Guideline. Consequently, the holding of *Stinson v. United States,* 508 U.S. 36, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993) that later commentary is authoritative does not apply here. This court has recognized that its rulings on sentencing can be informed by amended commentary to the Sentencing Guidelines. *See, United States v. Dedeker,* 961 F.2d 164 (11th Cir.1992). But, as was noted in that case, "nothing in the amended commentary either contradicts or substantively alters any relevant preexisting commentary," and "the changes merely supplement commentary carried over from the earlier version." *United States v. Dedeker,* at 166, note 4. Here, the case is far different and the alteration of actual Guideline language strongly suggests that a substantive change was being made.

That the amendment overturned earlier precedent in the Circuit is also significant. But, under *Stinson,* that can be done. Still, it cannot be done unless the amendment clarifies a meaning that was inherent in the original Guideline. If that meaning was needed to provide the fair warning required by the Constitution for criminal punishment it must be present with sufficient clarity to satisfy *ex post facto* concerns.

It is conceivable that, even with the change of Guideline language, the amendment by the Sentencing Commission might have been a "clarification" with retroactive effect if this court, in its earlier decisions, had indicated that it was interpreting ambiguous language and the "clarification" addressed that ambiguity.

---

to that comment as a clarification or rejecting it as a comment inconsistent with the plain meaning of the Guideline. 18 U.S.C. §§ 3553(a)(4),(b).

**4**

But this court reached its conclusions about the meaning of "express threat of death" by examining the plain meaning of the Guideline language and the plain examples given in the commentary, without detecting the slightest ambiguity in the matter.[6] Nor does the conflict between the circuits necessarily arise from ambiguity in the original Guideline. As noted by the D.C. Circuit, the Eighth Circuit in *United States v. Cadotte,* 57 F.3d 661, 662 (8th Cir.1995) Arnold, M.S., J., dissenting, cert. denied 516 U.S. 1076, 116 S.Ct. 783, 133 L.Ed.2d 733 (1996), and the Ninth Circuit in *United States v. Strandberg,* 952 F.2d 1149, 1151 (9th Cir.1991) "effectively replaced the 'express threat of death' requirement with the commentary's final sentence, 'focusing on the degree of fear that the robber instilled in a reasonable victim.' " *U.S. v. Robinson,* 86 F.3d 1197, 1203 (D.C.Cir.1996). The D.C. Circuit, dealing with a robber who said he would shoot someone if he was not given money, saw itself as taking a less extreme approach when it read "express" as "clear" and held that "clear" allowed the threat to be discerned by interpretation, inference or implication.implication.[7]

The Seventh Circuit opined that "a bank robber's pointing his hand through his coat pocket, while claiming to have a gun ..." can be an express threat of death. *U.S. v. Hunn,* 24 F.3d 994, 997 (7th Cir.1994). The Fourth Circuit, dealing with a bank robber who said, after his demand for money, "I have a gun pointed

---

[6]In *U.S. v. Canzater* "express" was understood to mean "directly" or "distinctly stated" or "clearly indicated" and "not when the threat is implied or left to inference." *Canzater* at 775. The same was understood in *U.S. v. Moore* and additional guidance was found in the examples given in the explanatory commentary. U.S.S.G. § 2B3.1(b)(2)(F), comment, note 7 read: An "express threat of death," as used in subsection (b)(2)(F), may be in the form of an oral or written statement, act, gesture, or combination thereof. For example, an oral or written demand using words such as "Give me the money or I will kill you", "Give me the money or I will pull the pin on the grenade I have in my pocket", "Give me the money or I will shoot you", "Give me the money or else (where the defendant draws his hand across his throat in a slashing motion)", or "Give me the money or you are dead" would constitute an express threat of death. The court should consider that the intent of the underlying provision is to provide an increased offense level for cases in which the offender(s) engaged in conduct that would instill in a reasonable person, who is a victim of the offense, significantly greater fear than that necessary to constitute an element of the offense of robbery.

[7]At the same time, the D.C. Circuit stated that "I have a gun" would be less likely to satisfy its requirements and "indeed, on its face, it is not a 'threat' at all." *U.S. v. Robinson* at 1203.

**5**

at you" found that language indistinguishable from the commentary example of "Give me the money or I will shoot you". *U.S. v. Murray,* 65 F.3d 1161, 1166-67 (4th Cir.1995).[8]

The Third Circuit, the only one dealing with the same "I have a gun" language as the cases in this Circuit, focused on the final sentence of the commentary to allow a threat of death to be based on the logical inferences of a reasonable victim. It also drew support from the then imminent deletion of the word "express" from the Guideline. *United States v. Figueroa,* 105 F.3d 874, 879-880 (3rd Cir.1997)

From the point of view of this Court, to the extent, if any, that other circuits have departed from a requirement that a threat of death be "express" they have done so not because of ambiguity in the Guideline, but due to either the mistaken understanding of plain language and specific examples or to the transformation of a necessarily vague summary of intent in the original commentary into the controlling standard of the Guideline. In any event, none of the other decisions purported to be dealing with ambiguous language.[9]

It follows that the Sentencing Commission was not clarifying ambiguous language but was making a substantive change in the Guideline by eliminating the key defining adjective in the operative language and expanding the guideline to cover conduct that was not "express." At the very least, it was making a new start

---

[8]That court criticized this Circuit for ignoring a commentary example it thought indicated a "direct implication" of death, i.e., the robber who says "Give me your money or else" and draws his hand across his throat in a slashing motion. This Court would obviously consider that the gesture of a hand slashed across the throat is an ancient and unmistakable *express* threat of death.

In a more convoluted situation a defendant was the accomplice of the robber who actually demanded money. The one who demanded the money said "or the person behind me [referring to the defendant accomplice] will shoot someone," The Tenth Circuit found that was an express threat of death by the silent accomplice by operation of Subsection (B) of U.S.S.G. § 1B1.3(a)(1) under which all reasonably foreseeable acts of joint actors in criminal activity are imputed to a defendant for sentencing purposes. *U.S. v. Lambert,* 995 F.2d 1006, 1009 (10th Cir.1993).

[9]Not surprisingly, on the question of the plain meaning of the word "express" and the original Guideline this court finds most persuasive the opinion in *United States v. Alexander,* 88 F.3d 427 (6th Cir.1996) and the dissenting opinions of Judge Easterbrook in *United States v. Hunn,* 24 F.3d 994, 999-1000 (7th Cir.1994); Judge Becker in *United States v. Figueroa,* 105 F.3d 874, 880-882 (3rd Cir.1997) Judge Rovner in *United States v. Carbaugh,* 141 F.3d 791, 795-798 (7th Cir.1998) and Judge Lynch in *United States v. Burns,* 160 F.3d 82, 86-87 (1st Cir.1998). Removing the word "express" made an increase of punishment apply to cases in which the threat of death was inferred or implied. That was a substantive change.

in the face of rampant confusion engendered by an inconsistency between the "express" Guideline as exemplified by the "express" examples in the commentary on the one hand and the final summarizing statement in the commentary on the other. And this required a substantive change in the text of the Guideline.

Further support for the view that this was a substantive amendment can be found in the fact that the Sentencing Commission withdrew its initial characterization of the amendment as clarifying. When the amendment was first proposed the Commission stated that it "adopts the majority view and clarifies the Commission's intent...." *Proposed Amendment to the Federal Sentencing Guidelines,* 60 Crim. L. Rep. (BNA) 2019, 2035 (Jan. 15, 1997). The "clarification" motive was not mentioned in the final amendment.

It is also apparent that any attempt to amend this guideline purely by means of commentary would have inevitably run into the plain meaning of "express" and led to extreme awkwardness and gross internal contradiction. For example, if the word "express" had been left untouched and the Commission had only added its new commentary that "... the defendant does not have to state expressly his intent to kill the victim in order for the enhancement to apply," the clash of meaning would have been palpable and irreconcilable. The word "express" had to be removed because it represented a meaning different from the one being fostered by the amendment, a meaning not inherent in the original Guideline; hence, the amendment was making a substantive change in the law. It was therefore a violation of the *ex post facto* clause of the Constitution to apply this amended Guideline to a crime committed at a time when a lesser punishment under the earlier Guideline was the law.

### III. CONCLUSION

For the foregoing reasons, this case is REVERSED and REMANDED for re-sentencing consistent with this opinion.

CARNES, Circuit Judge, dissenting:

The Ex Post Facto Clause requires us to decide whether Amendment No. 552 to the sentencing guidelines clarifies the meaning of U.S.S.G. § 2B3.1(b)(2)(F), or instead changes that meaning. If the

**7**

amendment only clarifies, then its application to cases like this one, which arose before its effective date, is permitted. If, however, the amendment changes the guideline's meaning, then its application to cases that arose beforehand is barred by ex post facto principles. I agree with my colleagues about that.

Where I disagree with them is on the pivotal question of whether the amendment does change, instead of simply clarify, § 2B3.1(b)(2)(F). Although not certain that my colleagues are mistaken in their different view, I believe that the amendment only clarifies and does not change the meaning of that guideline. The reasons that persuade my colleagues to the contrary fail to convince me.

It is true, as they point out, that Amendment No. 552 modified not only the explanatory commentary but also the text of § 2B3.1(b)(2)(F) itself. But so what? The language of a guideline as well as the language of its commentary can be ambiguous. The process of clarifying the meaning of a guideline, no less than the process of changing its meaning, can involve modification of the guideline language itself. Modification of language is, after all, the principal means by which one clarifies meaning.

Consider an example close to home. If my personal experience is a reliable guide, a judge makes numerous changes in the actual language of an opinion in the course of editing it. Usually, those changes are not done to alter the meaning of the opinion's holding or its reasoning, but instead are designed to clarify what is intended; most of those changes are made to prevent or resolve ambiguities. The same thing happens in the legislative process. When a dispute arises over the meaning of a provision in a statute, legislators sometimes try to clear up matters in committee reports, which are a kind of legislative commentary, but they also can and frequently do revise the actual language of the ambiguous provision itself in order to clarify its meaning. A change in the language of the provision itself does not mean its meaning has been changed; often all that has been done is to clarify the original meaning.

The same thing can and does happen with sentencing guidelines. If the language of a particular guideline is ambiguous, the best way for the Commission to resolve that ambiguity may be to modify the language of the guideline itself, not just the commentary. We should not conclude that the original intent or

**8**

meaning of a guideline has been changed merely because the Commission, in the course of exercising its function of ensuring that a guideline is interpreted uniformly, chooses to resolve an ambiguity by changing the guideline language itself.

Of course, this discussion assumes there was an ambiguity in § 2B3.1(b)(2)(F) to clarify. Proof of that ambiguity is found in the division of the circuits over the meaning of the guideline. If there had been no ambiguity, there would have been no disagreement among the circuits. Where circuits reach different conclusions about the meaning of the same language, which is what happened with this guideline, then that language is ambiguous. When an ambiguity is brought to the surface and results in differing applications of the same guideline, the Commission has the authority, perhaps the duty, to clarify matters. The Commission did so in this case, explaining the purpose of Amendment No. 552, as follows:

> This amendment addresses a circuit court conflict regarding the application of the "express threat of death" enhancement in § 2B3.1 (Robbery). The amendment adopts the majority appellate view which holds that the enhancement applies when the combination of the defendant's actions and words would instill in a reasonable person in the position of the immediate victim (*e.g.,* a bank teller) a greater amount of fear than necessary to commit the robbery. *See, e.g., United States v. Robinson,* 86 F.3d 1197, 1202 (D.C.Cir.1996) (enhancement applies if (1) a reasonable person in the position of the immediate victim would very likely believe the defendant made a threat and the threat was to kill, and (2) the victim likely thought his life was in peril); *United States v. Murray,* 65 F.3d 1161, 1167 (4thCir.1995) ("any combination of statements, gestures, or actions that would put an ordinary victim in reasonable fear for his or her life is an express threat of death").

U.S.S.G.App. C, amend. 552 (Nov.1997).

There was an ambiguity that gave rise to a circuit split over the meaning of the § 2B3.1(b)(2)(F) language. Most circuits addressing the language in question thought it meant something different from what this circuit did. The Commission needed to resolve the ambiguity and mend the split. It could have done so by going with either the majority or minority view. The Commission decided to adopt the majority view, and it effectuated that decision by changing the language of the guideline and the commentary to remove the ambiguity.

To be fair, there are two ways to interpret the Commission's adoption of the majority view about the meaning of § 2B3.1(b)(2)(F). One way is that the Commission went with the majority view, because that

**9**

view expresses what the Commission intended when it adopted the original language of the guideline, that is, the amendment signals that the majority of circuits which had spoken had gotten it right. The other way to interpret the amendatory action is that the majority view was not what the Commission intended to begin with, but on second thought the Commission concluded that view was the best policy result after all, and adopted it for that reason. Under that interpretation of the amendment, it was adopted to change the originally intended meaning of the guideline, and as it happens, the change brought the meaning around to what the majority of the circuits to have spoken thought (mistakenly) the initial language had meant. How do we decide which of these two interpretations of the Commission's action is correct?

I think the proper approach when the Commission has acted to resolve a circuit split is to presume that the Commission has carried out its duty to clarify ambiguous guideline language and has not changed its original view concerning the intended meaning of that language. That presumption should control absent some strong indication from the Commission that, in acting to resolve an ambiguity, it has changed what it originally intended the guideline to mean. Such a presumption serves the important purpose of ensuring national uniformity in application of the guidelines. Achieving uniformity is, after all, the purpose of having the Commission resolve ambiguities and mend circuit splits.

If we do not presume that amendments which resolve ambiguities and mend splits are clarifying, then courts which took the view not adopted by the Commission will often conclude, as my two colleagues have in this case, that the meaning of the guideline has been changed instead of clarified. They will do so largely because the Commission did not choose their circuit's view. Human nature being what it is, the reasoning goes like this: We held the guideline meant A, so that is what it meant; the Commission now says the guideline means B; therefore, the Commission has changed the meaning of the guideline.

Absent a presumption that split-mending amendments are clarifying, they will fail to achieve uniformity in cases which arose before the effective dates of the amendments. Courts, like this one, that took the view the Commission rejected, will believe the true meaning of the guideline has been changed, so, they

**10**

will continue to follow their contrary position. Courts that have not enshrined the mistaken view into their circuit law will more likely follow the clarified meaning. Courts that were on the prevailing side of the split certainly will follow the clarified meaning, because it is what they thought all along. Only when there are no more cases that arose before the effective date of an amendment will there be nationwide uniformity in application of the guideline in question. Thus, without a presumption that such amendments only clarify, not change, the Commission's intent concerning the appropriate application of the guideline, the benefit of uniform application which such amendments are designed to achieve will be lost for a number of years.

Applying the presumption of clarification to this case, I do not think there is any indication, much less a strong indication, that the Commission intended Amendment No. 552 to change the meaning of § 2B3.1(b)(2)(F). The explanation the Commission gave does not state, imply, or hint that it was doing any more than clarifying the guideline to remove the ambiguity clouding the original intent behind it. After identifying the circuit split which was the motivation for amending § 2B3.1(b)(2)(F), the Commission explained that "[t]he amendment adopts the majority appellate view...." U.S.S.G.App. C, amend. 552 (Nov.1997). A fair reading of that statement is that the Commission was acknowledging the majority of the circuits had correctly understood the Commission's original intent. The Commission did not say the majority of courts to decide the issue had misunderstood its intent and that the Commission was, upon reflection, changing its own intended view of the proper application of the guideline. Nor did the Commission otherwise indicate that the minority view of § 2B3.1(b)(2)(F) had correctly reflected the Commission's original intent.

In amending the guideline and commentary, the Commission did not change any of the examples in the commentary, examples which illustrate the intended application of § 2B3.1(b)(2)(F). The reason those examples were not changed is that the intended application was not being changed. If the Commission had thought the amendment effected a substantive change of the guideline, it would have altered the illustrative examples in the commentary to reflect that change.

**11**

The only arguable indication that the Commission intended to effect a substantive change is that it deleted from an earlier draft of the explanation for Amendment No. 552 an explicit statement that the amendment "clarifies the Commission's intent." *Proposed Amendment to the Federal Sentencing Guidelines,* 60 Crim. L. Rep. (BNA) 2019, 2035 (Jan. 15, 1997) But the rewriting of the explanatory language and the deletion of the explicit reference to clarification does not necessarily mean that the Commission thought the amendment was for some purpose other than clarification. The explicit reference to clarification could just as easily have been deleted as redundant in view of the other language explaining that the amendment "addresses a circuit conflict" and "adopts the majority appellate view." U.S.S.G.App. C, amend. 552 (Nov.1997). At most, the deletion of the express reference to clarification from the explanation is ambiguous and does not overcome the presumption, which should attend any amendment by the Commission in response to ambiguity in a guideline, that the amendment only clarifies the Commission's original intent concerning the proper application of the guideline.

Finally, because the Commission's power to clarify ambiguities in the Sentencing Guidelines is well established, a defendant cannot successfully claim, for ex post facto purposes, that he lacked "fair warning" that the Commission could clarify an ambiguous provision in a guideline in a manner unfavorable to him. The existence of the ambiguity itself provides notice that the guideline can be interpreted either way and that the Commission can resolve any difference of opinion about the matter to the defendant's detriment. Moreover, a defendant who is adversely affected by the Commission's decision to resolve an ambiguity and end a circuit split is not situated any differently from a defendant adversely affected by a Supreme Court decision resolving such an ambiguity. Just as there is no ex post facto problem, i.e., no lack of fair warning, when the Supreme Court resolves an ambiguity, there is none when the Commission does the same thing.

As I said at the beginning, I am not certain my colleagues are mistaken but I think they are. I would hold that Amendment No. 552, the sole purpose of which was to resolve a circuit split over the meaning of

**12**

§ 2B3.1(b)(2)(F), is a clarification of that guideline and not a change in its meaning.  As a result, applying it to cases that arose before the effective date of the amendment does not violate the Ex Post Facto Clause.