USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 98-2029

 UNITED STATES,

 Appellee,

 v.

 RICHARD A. GRAY,

 Defendant, Appellant.

 APPEAL FROM THE UNITED STATES DISTRICT COURT

 FOR THE DISTRICT OF MAINE

 [Hon. D. Brock Hornby, U.S. District Judge]

 Before

 Boudin, Circuit Judge,
 Bownes, Senior Circuit Judge,
 and Lynch, Circuit Judge.
 
 
 
 
 James S. Hewes for appellant.

 Margaret D. McGaughey, Assistant United States Attorney, with
whom Jay P. McCloskey, United States Attorney, was on brief for
appellee.

May 27, 1999

 BOWNES, Senior Circuit Judge. In the morning hours of
April 22, 1998, Richard A. Gray and his compatriot Robert L. Echols
entered the Key Bank in Portland, Maine, to perpetrate a robbery. 
They did so to obtain money for more drugs, after staying up all
night drinking and taking drugs. With Echols serving as lookout,
Gray delivered a note to the bank teller that read: "I got a gun. 
Give me all the money and know [sic] one will get hurt." The
teller asked Gray whether he was joking. In response, Gray lifted
his shirt and pointed to a black object secured in his waistband. 
The teller explained that her station was closed and that she
needed a key to unlock the drawer. After the teller disappeared
for what seemed an unusually long period of time in search of one,
Gray became unnerved and fled the scene.
 The two then improvised and decided to hold up a second
bank, believing their chances of success enhanced by all of the
police attention suddenly focused on Key Bank. Gray entered a
Fleet Bank branch office, while Echols waited in a nearby cab. 
This time, Gray's note said: "Give me all your money or I'll start
shooting." Having learned his lesson, Gray also orally assured the
teller that he was not playing a prank. The teller quickly stuffed
$11,907 into a paper bag and handed it to Gray. On his way out,
Gray apologized to the teller "for putting her though this." He
never actually had a gun during either episode.
 The pair was nabbed two days later, and each was charged
with two counts of violating the federal anti-robbery statute, 18
U.S.C. 2113(a). Gray, whose appeal is at issue here, pleaded
guilty to both counts and was sentenced principally to 54 months in
prison.
 On appeal, he assigns error to three decisions by the
sentencing court, contending that: (1) it should not have factored
into the sentencing calculus a prior conviction for which he had no
lawyer; (2) his actions during the Fleet Bank robbery did not
amount to a "threat of death" sufficient to trigger a two-point
enhancement; and (3) the court erred by considering a juvenile
adjudication for misdemeanor theft. We uphold the sentence.
 I
 Gray complains that the district court improperly used a
1997 misdemeanor theft conviction obtained without the benefit of
counsel to increase his criminal history score by one point. He
says uncounseled convictions may not be considered in fixing a
sentence under the federal guidelines, and that the docket sheet
suffices to show that he was not represented by counsel at his plea
hearing. In the alternative, he argues that the docket sheet
established a prima facie case that the conviction was defective,
and that the burden then shifted to the government to prove that
Gray either received a lawyer or waived his right to one. 
 In addressing this issue, the district court assumed that
Gray did not have counsel and held that he bore the burden of
showing that he did not waive his right to counsel, given the fact
he was sentenced only to time served. The court concluded that
Gray failed to demonstrate that he had not waived his right to
counsel, and therefore relied on the conviction to calculate Gray's
criminal history score. 
 We begin with the essentials. Once the government
establishes the fact of a prior conviction for sentencing purposes,
a "modest" burden satisfied here by the presentence report, "[t]he
burden then shifts to the defendant to establish that the earlier
conviction was constitutionally infirm . . . or otherwise
ineligible to be the basis for an upward adjustment." United
States v. Unger, 915 F.2d 759, 761 (1st Cir. 1990); see also United
States v. Cordero, 42 F.3d 697, 701 (1st Cir. 1994). Only if a
defendant meets this burden must the prior conviction be excluded
from the criminal history score. Otherwise, the presumption of
regularity remains undisturbed, and the conviction must be counted. 
 The preliminary question is to what extent do the
guidelines forbid consideration of misdemeanor convictions obtained
without the benefit of counsel? On this, U.S.S.G. 4A1.2(c) is
silent other than to provide generally that, with two categories of
exceptions not relevant here, "sentences for misdemeanor and petty
offenses are to be counted." The rest of the guidelines and
pertinent commentaries give mixed signals. On the one hand, the
guidelines do not confer on a defendant any right to collaterally
attack a prior conviction or sentence "beyond any such rights
otherwise recognized in law." See 4A1.2 comment. n.6. It is
also worth pointing out that the guidelines allow for consideration
of criminal conduct underlying any conviction not factored into the
criminal history score pursuant to 4A1.3 if the initial score
does not adequately reflect an individual's criminal history or
propensity to commit future crimes. See id. 
 On the other hand, the related background commentary does
say that "prior sentences, not otherwise excluded, are to be
factored into the criminal history score, including uncounseled
misdemeanor sentences where imprisonment was not imposed." By
negative implication, this language may be taken to mean that an
uncounseled misdemeanor offense is to be counted when it did not
result in jail time, but generally may not be counted where it led
to a prison term. See United States v. Ortega, 94 F.3d 764, 770-71
(2d Cir. 1996) (interpreting "section 4A1.2 [to] exclude[] from
criminal history computations all uncounseled misdemeanor sentences
of imprisonment"). And, whatever the guidelines may or may not
say, the case law is reasonably clear that a court may not fix a
sentence based in part on an uncounseled conviction that resulted
in incarceration. The Sixth and Fourteenth Amendments have been
interpreted to say that an individual may not be actually sentenced
to a term of imprisonment without being afforded the opportunity to
seek the advice of counsel, and that a conviction later determined
to be invalid cannot ordinarily be used to determine a future
sentence. See Scott v. Illinois, 440 U.S. 367, 373-74 (1979),
affirmed in Nichols v. United States, 511 U.S. 738, 746 (1994)
(drawing line "between criminal proceedings that resulted in
imprisonment, and those that did not"); Burgett v. Texas, 389 U.S.
109, 115 (1967) (Sixth Amendment forbids use of uncounseled
conviction "either to support guilt or enhance punishment for
another offense"); see also United States v. Tucker, 404 U.S. 443,
447-49 (1972). 
 We need not definitively establish whether and to what
extent uncounseled misdemeanors offenses may be counted, but
instead assume for the sake of argument that, under the sentencing
guidelines, a defendant would be entitled to exclude an uncounseled
misdemeanor conviction resulting in prison time. Nevertheless,
Gray, who bears the burden of proof, has failed to show that he did
not knowingly waive the assistance of counsel at his 1997 plea
hearing. 
 In an attempt to convince the district court that his
prior conviction for theft was void for purposes of sentencing,
Gray proffered a copy of the docket sheet from the state court
sitting in the Division of South Cumberland that had accepted his
guilty plea and sentenced him (there appeared to have been no
effort made to obtain a transcript or explain why one could not be
procured). The docket sheet shows that on February 26, 1997, the
same day of his arrest, Gray was charged with Theft by Unauthorized
Taking, a Class E offense, to which he pleaded guilty that very
day, and that the court sentenced him to 12 hours in jail, with
credit for time served, and ordered him to pay $10.00 in
restitution. It does not indicate that an attorney ever entered an
appearance on his behalf. The presentence report stated that
probation's review of the public records did not reveal whether
Gray had counsel on that occasion. Hence, it appears that he
pleaded guilty without the benefit of a lawyer a situation the
sentencing judge presumed to be the case as part of his analysis.
 Still, the record does not reflect whether or not Gray
chose to waive his right to counsel, a common enough occurrence
when a defendant is charged with a low level offense and is given
the possibility of walking out the courthouse doors a free man the
day of his arraignment in exchange for pleading guilty and
accepting a sentence of a small fine and time served. See Unger,
915 F.2d at 761 (stating that defendant attacking validity of
conviction must show "that he lacked counsel at [a critical]
juncture and had not waived his right in such regard"); see also
United States v. Allen, 153 F.3d 1037, 1041 (9th Cir. 1998) ("the
defendant must present evidence sufficient to overcome the
presumption that there was a valid waiver of counsel"), cert.
denied, 119 S. Ct. 1094 (1999). 
 We find no fault in the sentencing judge's refusal to
draw the inferences from the docket sheet urged by Gray. Not only
was the document silent on the critical questions, but Gray himself
did not testify at the sentencing hearing or file a sworn affidavit
to the effect that he was not afforded counsel. Because a
defendant stands in the best position to offer a first-hand account
of the details of his own past legal proceedings, his silence can
be deafening. See Parke v. Raley, 506 U.S. 20, 32 (1992) ("when
the plea was entered in another jurisdiction, the defendant may be
the only witness who was actually present at the earlier
proceeding"); Cordero, 42 F.3d at 701 (noting that defendant never
swore that he did not have a lawyer, only that government never
proved that he had one); United States v. Wilkinson, 926 F.2d 22,
28 (1st Cir. 1991) (same). So it was here.
 Gray would add a new wrinkle, citing a line of cases
standing for the proposition that waiver of counsel may not be
presumed from a silent record. See, e.g., Burgett, 389 U.S. at
114-15. He wishes us to extrapolate from these opinions a rule
that would shift the burden back to the government at some point to
show that the defendant either was afforded counsel or waived that
right. But Parke v. Raley, 506 U.S. 20, forecloses his argument.
 In Parke, a state prisoner filed a habeas petition
seeking vacatur of a state court sentence that had been enhanced
based on a prior conviction on the ground that his guilty plea,
upon which the earlier conviction rested, had not been entered
knowingly and intelligently. The Court held that "the 'presumption
of regularity' . . . attaches to final judgments, even when the
question is waiver of constitutional rights." Id. at 29. Turning
to the facts of the case at hand, the Court said that the
petitioner could not demonstrate that a prior conviction was
constitutionally defective by simply relying on the unavailability
of a transcript. In reaching its conclusion, the Court
distinguished Boykin v. Alabama, 395 U.S. 238 (1969), which holds
that the government must ordinarily prove that a guilty plea was
knowing and voluntary, saying: 
 On collateral review, we think it defies logic
 to presume from the mere unavailability of a
 transcript (assuming no allegation that the
 unavailability is due to governmental
 misconduct) that the defendant was not advised
 of his rights. In this situation, Boykin does
 not prohibit a [subsequent] court from
 presuming, at least initially, that a final
 judgment of conviction offered for purposes of
 sentencing enhancement was validly obtained. 

506 U.S. at 30. The Parke Court also explicitly rejected the very
argument made by Gray, that under Burgett "every previous
conviction used to enhance punishment is 'presumptively void' if
waiver of a claimed constitutional right does not appear from the
face of the record." Id. at 31. In so doing, the Court limited
that decision to its narrow historical context: because the prior
plea at issue there was entered before a federal constitutional
right to counsel had been recognized, it was reasonable to then
presume from the silent record "that he had not waived a right he
did not possess." Id. The implication for us, of course, is that
it is not at all unreasonable to assume from a near-empty record
that Gray knowingly waived his right to counsel and a jury trial in
1997 when he was offered a sweet deal.
 Although Parke was a habeas case and not a sentencing
case, for these purposes this is a distinction without a
difference. See id. at 29-30 (stating that presumption of
regularity applies to other forms of collateral attack); see also
Allen, 153 F.3d at 1041 (applying Parke's reasoning to indirect
challenge to prior conviction at federal sentencing); United States
v. Gilbert, 20 F.3d 94, 100-01 (3d Cir. 1994) (same). Both habeas
and sentencing proceedings may involve collateral attacks of sorts
on a presumptively valid prior criminal judgment. The Court
obviously found the situations analogous as well, for it cited with
approval various court of appeals decisions "allocat[ing] the full
burden of proof to defendants claiming that an invalid guilty plea
renders a prior conviction unavailable for purposes of calculating
criminal history under the Sentencing Guidelines." 506 U.S. at 33
(citing sentencing cases). In all events, we read Parke to
preclude Gray's suggested legal framework that would transfer the
burden back to the government based on a silent record.
 Gray made a tactical decision not to build a more robust
record or testify at the sentencing hearing and to instead rely
heavily upon a mistaken legal presumption. Because his proof of a
defective conviction was inadequate, the sentencing judge properly
overruled his opposition to its inclusion in his criminal history
score. 
 II
 We next consider whether the sentencing judge properly
invoked U.S.S.G. 2B3.1(b)(2)(F), which calls for a two-point
enhancement to the base offense level for robbery "if a threat of
death was made." To the extent that we evaluate the trial court's
interpretation of the guidelines or its final determination to see
whether the facts here supported a finding that Gray made a threat
of death during the Fleet Bank robbery, we look at the issue de
novo, but any factual disputes entail clear error review. See
United States v. Brown, 169 F.3d 89, 92 (1st Cir. 1999). Before
the enhancement may be imposed, the record must support a finding
that a defendant's actions and statements, taken as a whole, "would
instill in a reasonable person, who is a victim of the offense, a
fear of death." U.S.S.G. 2B3.1 comment. n.6. 
 Although Gray contends that his threat to the teller was
not sufficiently specific (he never actually used the precise
words, "I will kill you"), that argument is foreclosed by the 1997
amendment to this provision deleting the word "express," which
removed any ambiguity as to whether an implicit threat of death
would qualify. It does. See id. ("the defendant does not have to
state expressly his intent to kill the victim in order for the
enhancement to apply"). In any event, this Circuit had already
joined those pre-amendment courts which held that a defendant need
not explicitly communicate an intent to kill to trigger the
enhancement. See United States v. Burns, 160 F.3d 82, 85 (1st Cir.
1998). 
 It remains only to be seen whether the present
circumstances satisfy the applicable test. Gray says no, tethering
his argument mainly to a single fact: that he apologized to the
teller for inconveniencing her during the robbery. From this, Gray
reasons that it was objectively unreasonable for the teller to fear
for her life. But this remark does not save him from the force of
his actions. The fact that Gray may have been genuinely reluctant
to use violence to achieve his ends does not alter the objectively
dangerous situation created by his conduct (or suggest that he
would not have shot to kill if necessary); he never once
communicated an unwillingness to use deadly force. His
unmistakable threat to use a lethal weapon itself puts this case
well within the mainstream of death-threat scenarios. See, e.g.,
Burns, 160 F.3d at 83 ("I have a gun! Don't make me use it.");
United States v. Bomski, 125 F.3d 1115, 1118 (7th Cir. 1997) ("This
is a bomb. . . . give me all of your money" sufficient); United
States v. Figueroa, 105 F.3d 874, 875 (3d Cir.) ("I have a gun. 
Give me all the money" scrawled on napkin), cert. denied, 520 U.S.
1248 (1997); United States v. Hunn, 24 F.3d 994, 997 (7th Cir.
1994) (defendant mimicked pointing gun through his coat while
delivering note that said, "Give me all the money now. I have a
gun. No tricks, I'm watching."); United States v. Eaton, 934 F.2d
1077, 1079 (9th Cir. 1991) ("Give me all your money or I'll
shoot"). That he never actually had a gun in his possession made
no meaningful difference to the teller, for she could not have
discerned that from all the outward signs. 
 Gray mouthed an apology only after he had received the
money, as he exited the bank. His expressed remorse therefore did
nothing to lessen, much less negate, the reasonable fear that
spurred the teller to cooperate in the first place. By then, the
earlier threat of death was dissipating, and the encounter almost
over. 
 Given this fact pattern, we are satisfied the sentencing
judge did not err in assessing the two-point enhancement.
 III
 Appellant's final claim does not detain us long. As part
of its criminal history calculation, the sentencing court assessed
one point based on a 1994 juvenile adjudication for theft. Relying
on a state law making certain juvenile adjudications (i.e., Class
D or lower) off-limits for future proceedings, 8 Me. Rev. Stat.
Ann. tit. 15, 3308 (Supp. 1998), Gray asserts that this provision
bars a subsequent federal court from considering the juvenile
disposition, and that the sentencing judge erred when it counted
his 1994 juvenile disposition. We scrutinize this legal argument
in plenary fashion. 
 Title 15, section 3308.2 reads, in pertinent part: 
 In the case of a hearing open to the general
 public under section 330, the petition, the
 record of the hearing and the order of
 adjudication are open to public inspection,
 provided that any court subsequently
 sentencing the juvenile after the juvenile has
 become an adult may consider only murder and
 Class A, Class B and Class C offenses
 committed by the juvenile.

While the phrase "any court subsequently sentencing the juvenile"
is admittedly broad, it is by no means obvious that the Maine law
purports to prevent federal courts from considering juvenile
offenses in fixing sentences for violations of federal law. We
find no hint at all in the language of the statute of an intent to
erect such a shield. 
 Even assuming that the provision directly conflicts with
federal law, that reading of the law would fall under the force of
the Supremacy Clause. See U.S. Const. art. VI, cl. 2. Whether a
particular offense falls within the federal guidelines' criminal
history framework "is a question of federal law, not state law."
Unger, 915 F.3d at 762. States enjoy a broad range of flexibility
in choosing how they will treat those who offend their laws. But
they may not dictate how the federal government will vindicate its
own interests in punishing those who commit federal crimes. See
United States v. Carney, 106 F.3d 315, 317 (10th Cir. 1997); United
States v. Daniels, 929 F.2d 128, 130 (4th Cir. 1991).
 Finally, Gray seeks to invoke the Due Process Clause and
the Tenth Amendment to bar consideration of his juvenile
adjudication. Yet Gray never once explicitly referred to either
ground before the district court. The category of constitutional
claims he now asserts, not seasonably raised below, cannot be given
life for the first time in this forum. See United States v.
Bongiorno, 106 F.3d 1027, 1034 (1st Cir. 1997). Seemingly resigned
to the fate of his due process claim, Gray maintains in his reply
papers that he adequately preserved his Tenth Amendment claim when
he told the sentencing judge that the matter involved federalism
and that "a Maine statute supercedes a federal guideline." But
this explanation seemed geared toward his statutory argument. More
important, a passing reference to our federalist system of
government hardly suffices to put the court on notice of a Tenth
Amendment challenge, especially where he did not object to the
court's failure to recognize the constitutional argument, if indeed
one was intended. 
 Affirmed.