**UNITED STATES of America, Appellee,**

v.

**Thomas J. BURNS, Defendant, Appellant.**

**No. 98–1271.**

United States Court of Appeals,
First Circuit.

Heard Oct. 6, 1998.

Decided Nov. 20, 1998.

---

Miriam Conrad for appellant.

Robert E. Richardson, Assistant United States Attorney, with whom Donald K. Stern, United States Attorney, was on brief for appellee.

Before LYNCH, Circuit Judge, CYR, Senior Circuit Judge, and LIPEZ, Circuit Judge.

CYR, Senior Circuit Judge.

Defendant Thomas J. Burns challenges the two-point sentencing enhancement imposed upon him by the district court pursuant to USSG § 2B3.1(b)(2)(F) (1995) for having made "express threat[s] of death" during two separate bank robberies. We affirm.

## I

### BACKGROUND

Burns robbed the banks in the spring of 1997, on each occasion handing the teller a note warning: "I have a gun! Don't make me use it." After the government charged Burns with two counts of bank robbery, see 18 U.S.C. § 2113(a), the parties arrived at a plea agreement whereby the government promised to refrain, "at sentencing," from recommending that Burns receive the two-level enhancement under § 2B3.1(b)(2)(F) for making "express threat[s] of death" during the robberies. Although the government abided by its agreement, the district court nevertheless elected to impose the two-level enhancement.

## II

### DISCUSSION

**A. The Scope of the Plea Agreement**

Before addressing the merits, we turn to Burns' motion to strike the government's brief on appeal. Burns insists that the government cannot be heard to contend on ap-

peal that the district court correctly imposed the very sentencing enhancement which the government, pursuant to the plea agreement, agreed to refrain from recommending "at sentencing," see Plea Agreement ¶ 3.

 We acknowledge concerns regarding the government's ambivalence, especially since a commonsense understanding of the language of the plea agreement itself offers little hint that the parties mutually contemplated that the government remained free to advocate a two-level enhancement on appeal. As we repeatedly have made clear, moreover, "[b]ecause plea bargaining requires defendants to waive fundamental constitutional rights, we hold prosecutors engaging in plea bargaining to 'the most meticulous standards of both promise and performance.'" *United States v. Velez Carrero*, 77 F.3d 11, 11 (1st Cir.1996) (citation omitted). *See United States v. Clark*, 55 F.3d 9, 12 (1st Cir.1995); *Correale v. United States*, 479 F.2d 944, 947 (1st Cir.1973). We think the message is clear, therefore, that significant plea-agreement terms should be stated explicitly and unambiguously so as to preclude their subsequent circumvention by *either* party. *See United States v. Canada*, 960 F.2d 263, 269 (1st Cir.1992) (noting that the government not only is forbidden from any "explicit repudiation of [its] assurances," but from "end-runs around them"); *United States v. Garcia*, 698 F.2d 31, 37 (1st Cir.1983) ("'A plea agreement is not an appropriate context for the Government to resort to a rigidly literal approach in the construction of language.'") (citation omitted). Thus, defense counsel too must be alert to the need for clear and explicit articulation of all pertinent terms in any plea agreement negotiated with government counsel.

In the instant case, however, it is not necessary to determine whether the government breached its plea agreement, as we would be obliged in all events to consider whether the district court correctly imposed the sentencing enhancement at issue in this case, with or without the benefit of the government's advocacy on appeal. Accordingly, we now turn to the language of § 2B3.1(b)(2)(F), which we construe *de novo*.

See *United States v. Nicholas,* 133 F.3d 133, 134 (1st Cir.1998).

### B. *USSG § 2B3.1(b)(2)(F)*

██ Burns argues that the notes handed to the bank tellers—expressly threatening to use a gun—were not "express threat[s] of death" for purposes of § 2B3.1(b)(2)(F) because they fairly could be interpreted simply to imply an intention to use a gun to fire warning shots or to shoot only to wound, rather than to kill. The applicable guidelines section provided:

> (A) If a firearm was discharged, increase [the base offense level] by 7 levels; (B) if a firearm was otherwise used, increase by 6 levels; (C) if a firearm was brandished, displayed, or possessed, increase by 5 levels; (D) if a dangerous weapon was otherwise used, increase by 4 levels; (E) if a dangerous weapon was brandished, displayed, or possessed, increase by 3 levels; or (F) if an *express threat of death* was made, increase by 2 levels.

USSG § 2B3.1(b)(2) (emphasis added).[1]

The courts of appeals which have considered the issue to date ascribe two conflicting interpretations to the pivotal guideline phrase "express threat of death." Seven circuits presently hold that the defendant need not have expressed in words or actions an intention "to kill," provided the words or actions employed were such as to place the victim in objectively reasonable fear for his or her life. *See United States v. Figueroa,* 105 F.3d 874 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 1860, 137 L.Ed.2d 1061 (1997); *United States v. Murray,* 65 F.3d 1161 (4th Cir.1995); *United States v. Carbaugh,* 141 F.3d 791 (7th Cir.1998); *United States v. Tolen,* 143 F.3d 1121 (8th Cir.1998); *United States v. France,* 57 F.3d 865 (9th Cir.1995); *United States v. Lambert,* 995 F.2d 1006 (10th Cir.1993); *United States v. Robinson,* 86 F.3d 1197 (D.C.Cir.1996).

These decisions rely on guideline commentary squarely in point here:

An "express threat of death," as used in subsection (b)(2)(F), may be in the form of an oral or written statement, act, gesture, or combination thereof. For example, an oral or written demand using words such as "Give me the money or I will kill you," "Give me the money or I will pull the pin on the grenade I have in my pocket," "Give me the money or I will shoot you," "Give me your money or else (where defendant draws his hand across his throat in a slashing motion)", "Give me your money or you are dead" would constitute an express threat of death. The court should consider that the intent of the underlying provision is to provide an increased offense level for cases in which the offender(s) engaged in conduct that would instill in a *reasonable person,* who is a victim of the offense, *significantly greater fear* than that necessary to constitute an *element of the offense* of robbery.

USSG § 2B3.1, comment. (n.6) (1995) (emphasis added). Importantly, these courts accord the quoted commentary deference as a reasonable interpretation of § 2B3.1(b)(2)(F) by the United States Sentencing Commission. "The Commission, after all, drafts the guidelines as well as the commentary interpreting them, so we can presume that the interpretations of the guidelines contained in the commentary represent the most accurate indications of how the Commission deems that the guidelines should be applied to be consistent with the Guidelines Manual as a whole as well as the authorizing statute." *Stinson v. United States,* 508 U.S. 36, 45, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993).

Two other courts of appeals have held that the term "express" contemplates nothing less than that the defendant have unambiguously declared, either through words or unambiguous conduct, that he intends to *kill* the victim. *See United States v. Alexander,* 88 F.3d 427 (6th Cir.1996); *United States v. Moore,* 6 F.3d 715 (11th Cir.1993). Citing one common definition of the adjective "express"—"[d]irectly and distinctly stated or expressed *rather than implied or left to in-*

---

1. Although Burns was sentenced under the 1995 version, whereas the current version of § 2B3.1(b)(2)(F) no longer includes the term "express," the dispute as to whether the amendment is substantive or merely declarative of preexisting law turns entirely on the correct meaning of the 1995 version, *see infra.*

*ference," Alexander,* 88 F.3d at 430 (emphasis added)—these courts hold that Application Note 6 cannot control the interpretation of § 2B3.1(b)(2)(F) because Note 6 focuses on the victim's reasonable perceptions, thus is *inconsistent* with the guideline language itself, which focuses exclusively on the literal wording of the threat. *See Stinson,* 508 U.S. at 38, 113 S.Ct. 1913 ("[C]ommentary in the Guidelines Manual that interprets or explains a guideline is authoritative *unless* it violates the Constitution or a federal statute, or is *inconsistent with,* or a plainly erroneous reading of, that guideline.") (emphasis added); *United States v. Damon,* 127 F.3d 139, 145 n. 7 (1st Cir.1997) (same). Thus, declarations such as "I have a gun," or even "I will use my gun," are not to be considered "express threats of death" because the victim necessarily must supply the ultimate inference that the defendant means to shoot to kill, not merely to wound. We opt for the majority view.

■ Before sentencing guideline language and its related commentary may be deemed mutually inconsistent, the court must determine that "following one will result in violating the dictates of the other." *Stinson,* 508 U.S. at 43, 113 S.Ct. 1913. Although the adjective "express" commonly connotes "[d]irectly and distinctly stated or expressed rather than implied or left to inference," in the alternative it may simply mean something which is *perceived as* "clear" and "unambiguous." *See Figueroa,* 105 F.3d at 877 (citing *Robinson,* 86 F.3d at 1200). Thus construed, § 2B3.1(b)(2)(F) focuses not upon the criminal defendant's subjective intent as expressed through the literal language of the threat, but upon the likely inferences which the victim reasonably might draw in the circumstances. Moreover, nothing in the term "express" itself remotely *compels* the conclusion that Congress intended the most restrictive interpretation of § 2B3.1(b)(2)(F). Consequently, even if we were inclined to interpret the term "express" differently than the Commission, we would defer to the guideline commentary because the term "express" reasonably is construed in context as synonymous with "perceived as clear and unambiguous."

The Sentencing Commission gloss on § 2B3.1(b)(2)(F) goes well beyond the merely plausible, however; it is an eminently sensible assessment of the likely legislative intent. The commentary instructs that "[t]he court should consider that the intent of [§ 2B3.1(b)(2)(F) ] is to provide an increased offense level for cases in which the offender(s) engaged in conduct that would instill in a reasonable person, who is a victim of the offense, *significantly greater fear* than that necessary to constitute an element of the offense of robbery." *See* USSG § 2B3.1, comment. (n.6) (1995) (emphasis added).

The offense of robbery contemplates simply that the defendant have subjected his victim to minimal levels of fear or "intimidation." *See* 18 U.S.C. § 2133(a). Courts generally evaluate levels of "intimidation" under an *objective* standard: whether a reasonable person in the same circumstances would have felt coerced by a threat of *bodily harm. See, e.g., United States v. Henson,* 945 F.2d 430, 439–40 (1st Cir.1991); *see also United States v. Askari,* 140 F.3d 536, 541 (3d Cir. 1998) (en banc); *United States v. Woodrup,* 86 F.3d 359, 363–64 (4th Cir.1996); *United States v. Foppe,* 993 F.2d 1444, 1451 (9th Cir.1993).

Section 2B3.1(b)(2) identifies six settings, in descending order of seriousness, wherein a defendant will be found to have engaged in something more than mere "intimidation," so as to enhance the actual or perceived risk to the victim. *See Lambert,* 995 F.2d at 1008 ("Although coercion and at least implied threats are necessarily involved in the bank robbery offense, express threats of death are not."). Thus, the Sentencing Commission determination to interpret "express threat of death" under an objective, reasonable-person standard, rather than the subjective standard advocated in *Alexander* and *Moore, supra,* comports with the standard for assessing "intimidation" under 18 U.S.C. § 2113(a). The remaining question, then, is whether the notes Burns passed to the tellers came within the definition of "express" contained in the guideline commentary.

■ We would be loathe to hold that a reasonable bank teller—presented with a demand for money stating: "I have a gun!

Don't make me use it."—would be *unlikely* to infer that the robber was announcing his readiness to use the gun. Moreover, even assuming that quibbles as to whether the robber meant to shoot to kill, or merely to wound, are likely to occur at all to a teller actually confronted by a bank robber, they simply do not represent distinctions of compelling weight under an "objective reasonableness" standard. As the Third Circuit has observed, "[i]n the calmer atmosphere of a sentencing colloquy, the[se] different wordings may seem significant; however, in the tense environment of a bank robbery, the differences are truly only semantic and negligible." *Figueroa,* 105 F.3d at 878. *See United States v. Hunn,* 24 F.3d 994, 998 (7th Cir.1994) (requiring that defendant say "I will kill you" "discounts real-world uncertainties").[2]

In our judgment it is highly probable that an objectively reasonable person, confronted by Burns' threat to "use" the gun he claimed to possess unless the teller turned over the money, would draw little comfort from any surmise concerning whether Burns actually had a gun; whether he really meant to use it; and, if so, whether he intended merely to wound rather than kill absent compliance. Thus, the coercive power Burns brought to bear in these robberies far exceeded the minimal level of "intimidation" required under 18 U.S.C. § 2133(a), *see supra. See, e.g., Robinson,* 86 F.3d at 1202 ("[A] reasonable teller receiving a note from a bank robber would very likely infer that 'shoot' means 'kill'."); *United States v. Jones,* 83 F.3d 927, 929 (7th Cir.1996) (noting: when defendant states he has a gun and will use it, "[w]hy would anyone want to assume that he was merely a liar or a bluffer?").

### III

### CONCLUSION

We therefore conclude that the Sentencing Commission gloss on § 2B3.1(b)(2) in Application Note 6 warrants due deference as a plausible interpretation by the agency entrusted by Congress with the responsibility to administer the guidelines and that the Burns threats in this case came within the definition of "express threat" adopted by the Commission.

*Affirmed.*

LYNCH, Circuit Judge, dissenting.

I respectfully dissent from the well-crafted majority opinion, joining instead the reasoning of the Eleventh Circuit in *United States v. Tuck,* 964 F.2d 1079 (11th Cir.1992), of the Sixth Circuit in *United States v. Alexander,* 88 F.3d 427 (6th Cir.1996), of Judge Easterbrook, dissenting in *United States v. Hunn,* 24 F.3d 994 (7th Cir.1994), of Judge Becker, dissenting in *United States v. Figueroa,* 105 F.3d 874 (3d Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 1860, 137 L.Ed.2d 1061 (1997), and of Judge Arnold, dissenting in *United States v. Cadotte,* 57 F.3d 661 (8th Cir.1995). Given the forceful and clear expressions of the rationale in those opinions, I add only a few words.

The issue is whether a note, handed by the defendant bank robber to a teller, constitutes an "express threat of death." The note read: "I have a gun! Don't make me use it." No gun was seen or otherwise gestured to, so the issue entirely turns on the words of the note. If the note is an express threat, then an additional two levels, or a range of 14 to 18 months, were properly added by the district court to the sentence.

The common definition of an "express" threat is a threat which is "definitely and explicitly stated," *The American Heritage Dictionary* (2d College ed.1985), or "distinctly stated or expressed rather than implied or left to inference," *Webster's Third New International Dictionary* 803 (1993), or "clear; definite; explicit; unmistakable; not dubious

---

2. We respectfully acknowledge that the majority view on the proper interpretation of "express threat of death" has provoked vigorous dissents from able jurists. *See Figueroa,* 105 F.3d at 880 (Becker, J., dissenting); *United States v. Hunn,* 24 F.3d 994, 999 (7th Cir.1994) (Easterbrook, J., dissenting). We note, nonetheless, that in both cases the defendants stated: "I have a gun." Unlike Burns, neither defendant asserted an intention to "use" the gun. Thus, we have no occasion to consider whether the specific threats employed in those cases constituted "express threat[s] of death."

or ambiguous," *Black's Law Dictionary* 691 (4th ed.1951). By any common understanding of the term "express threat of death," this note was not such a threat.

Nevertheless, the majority and several other circuits are persuaded by the commentary to the Guidelines, as the majority opinion skillfully explains. But the Commission in the guise of commentary is not free to change the meaning of the Guidelines, *see Stinson v. United States,* 508 U.S. 36, 43, 113 S.Ct. 1913, 123 L.Ed.2d 598 (1993), and that, on the facts of this case, is what is happening here. As Chief Justice John Marshall said almost one hundred and eighty years ago: "Where there is no ambiguity in the words, there is no room for construction. The case must be a strong one indeed, which would justify a Court in departing from the plain meaning of words, especially in a penal act, in search of an intention which the words themselves did not suggest. To determine that a case is within the intention of a statute, its language must authorize us to say so." *United States v. Wiltberger,* 18 U.S. (5 Wheat.) 76, 95–96, 5 L.Ed. 37 (1820).

What harm is there in this? The harm to Burns is concrete—more time in prison. There is harm to the law as well. One harm is that articulated by Judge Easterbrook— that this Guideline is part of a series of sanctions meant to gradate degrees of threats, and this result "dissolves the difference" in degree. *See Hunn,* 24 F.3d at 999 (Easterbrook, J., dissenting). The intent of this particular law is thus perverted.

Another harm is even more fundamental and is to the structure of the law. The law should mean what it says. The Supreme Court has weighed the constitutional effects of laws by taking them to mean what they say, finding that the appropriate measure. *See Baggett v. Bullitt,* 377 U.S. 360, 374, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964) (invalidating state-mandated oath of office and replying to state's contention—that people would not decline to take the oath out of fear because there was little reason to fear prosecution—by saying that "[t]his contention ignores not only the effect of the oath on those who will not solemnly swear unless they can do so honestly and without prevarication and

reservation, but also its effect on those who believe the written law means what it says."). If the law does not mean what it says, as has happened here, then it has failed to meet one of the most basic requirements for any fair and just legal system.