UNITED STATES of America, Appellee,

v.

James LEONARD, Defendant–Appellant,

Robert Seyfert, John Papajohn and Donald M. Brown, Defendants.

No. 428, Docket 94–1175.

United States Court of Appeals, Second Circuit.

Argued Dec. 2, 1994.

Decided March 28, 1995.

Ralph Drury Martin, Washington, DC (Storch & Brenner, Washington, DC, Joseph Garneau, West Hempstead, NY, of counsel), for defendant-appellant.

Robert A. Feinberg, Asst. U.S. Atty., Brooklyn, NY (Zachary W. Carter, U.S. Atty., E.D.N.Y., David C. James, Eric O. Corngold, Asst. U.S. Attys., of counsel), for appellee.

Before: VAN GRAAFEILAND, MINER, and LEVAL, Circuit Judges.

MINER, Circuit Judge:

Defendant-appellant James Leonard appeals from a judgment of conviction and sentence entered on March 22, 1994 in the Unit-

ed States District Court for the Eastern District of New York (Hurley, J.), the defendant having pleaded guilty to conspiring to distribute hashish, in violation of 21 U.S.C. § 841(a)(1). The district court sentenced Leonard to a prison term of seventy months, a five-year term of supervised release and a $50 special assessment. Leonard challenges his sentence on two grounds. He contends that the district court erred in failing to conduct an evidentiary hearing to determine whether the government acted in bad faith in refusing to honor a plea agreement. Leonard also contends that the district court improperly granted him a two-level, rather than a three-level, reduction in his offense level for "acceptance of responsibility" under U.S.S.G. § 3E1.1. For the following reasons, we conclude that the district court should have conducted an evidentiary hearing on the issue of the government's compliance with the plea agreement and that the district court erred in failing to grant Leonard a three-level reduction for "acceptance of responsibility."

## BACKGROUND

### 1. Investigation and Arrest of Leonard

In the fall of 1990, an agent of the Drug Enforcement Administration ("DEA") obtained the name of defendant James Leonard from a heroin trafficker. The heroin trafficker informed the agent that Leonard owed money to him as a result of a prior drug deal. Armed with this information, a confidential informant ("CI") using the name "Ellie" contacted Leonard in October of 1990, and, over the course of the next several months, the two discussed potential narcotics transactions. In August of 1991, the CI informed Leonard that he had arranged for the shipment of two tons of hashish into the United States and that he had 500 kilograms of the hashish available for sale. Leonard told the CI that he would locate buyers for the hashish.

On September 12, 1991, the CI arranged to give Leonard a sample of the hashish. The two met in Brooklyn, where the CI gave Leonard two "bricks" of hashish, each weighing approximately ½ kilogram, as samples. On September 15, 1991, the CI and Leonard

met again and discussed the transaction, including a price of $1,300 per pound, of which $300 per pound would be split between the CI and Leonard. According to the government, Leonard spoke by telephone during this meeting with an individual who subsequently was identified as Donald Brown. Leonard told the CI that Brown was attempting to meet "the Canadians," who were going to buy the bulk of the 500 kilograms of hashish.

On September 19, 1991, Leonard was arrested after delivering approximately $300,-000 in cash as payment for the first purchase of hashish. Two other men, Robert Seyfert and John Papajohn, also were arrested on that day, having supplied Leonard with $200,000 in cash for the purchase. After Leonard was arrested and given his *Miranda* warnings, he made oral statements regarding the transaction. Leonard then was transferred to DEA headquarters, where he answered additional questions and signed a written statement. The following is a verbatim reproduction of that statement:

> On 19 Sept 91, I was supposed to buy 300 pounds of hashish, of which 200 lbs was going to Robert Siyfert. Siyfert provided all of the funds which I had given to Ellie during the morning and afternoon of 19 Sept.
>
> One hundred pounds was supposed to go to Paul LNU at 114 Bay 49th St. in Brooklyn, the lower apartment. I was supposed to bring the 100 lbs to show to Paul who was going to arrange a buyer for it.
>
> I also spoke with Donald Brown who said they could buy the whole load of 3 tons. After I got the sample on 12 Sept. I contacted Brown and told Brown I had a sample and wants to sell it for about $1,200.00 a pound. Brown said that was a good price and that he could make some money on it. Brown said he would ask around and that he (Brown) knew some Canadiens who would be willing to come into N.Y.
>
> I gave a sample of hashish to Siyfert on 12 Sept who later told me it was good. Additionally the prior week, I picked up

Donald Brown at J.F.K. When I received the sample I also gave Brown one of the two brick packages that I had removed from the boxes. There were also several other people I had provided samples to.

I was supposed to get 100 dollars per pound as a broker fee for each pound sold.

### 2. Investigation of Donald Brown

Having received Leonard's statement, the government sought to prosecute Donald Brown for his participation in the conspiracy. There is a dispute, however, as to the method that the government used. According to Leonard, government agents instructed him to contact Brown and to convince Brown to turn himself in. In contrast, the government contends that it wanted Leonard to hide his arrest and cooperation from Brown, so that Leonard could aid in an attempt to arrest Brown. It is undisputed that Leonard was in contact with Brown soon after his arrest, and that he kept in contact with Brown thereafter.

### 3. Leonard's Cooperation Agreement

Shortly after his arrest, Leonard entered into an oral plea agreement with the government, pursuant to which Leonard would assist the government in its investigation of his co-conspirators. For approximately two months thereafter, Leonard provided his cooperation, which included taping conversations with Paul Witiw, who was identified as the "Paul LNU" referred to in Leonard's statement. These conversations led to the arrest of Witiw and two other drug traffickers. On October 10, 1991, during the period of cooperation, Assistant United States Attorney Eric Corngold sent Leonard a proposed written plea agreement. The agreement provided that Leonard would plead to the charge of conspiracy to distribute and to possess with intent to distribute hashish, and stated:

If the Office determines that [Leonard] has cooperated fully, provided substantial assistance to law enforcement authorities and otherwise complied with the terms of this agreement, the Office will file a motion with the sentencing court ... [that] will permit the court, in its discretion, to im-

pose a sentence below the applicable sentencing guideline range.

The quoted provision essentially restates section 5K1.1 of the sentencing guidelines, which authorizes the sentencing court to make a downward departure upon the government's motion indicating that a defendant has provided "substantial assistance." Leonard and his attorney signed the agreement and returned it to the government for signature.

Shortly thereafter, a proffer session was conducted with the government in which Leonard and defense counsel discussed Leonard's cooperation with the government in its investigation of Brown. Representing the government at the meeting were Assistant United States Attorney Corngold, DEA Special Agent Kaladi, and another unidentified DEA agent. According to Corngold, Leonard made statements at the meeting about his dealings with Brown that were inconsistent with his prior oral and written statements. For example, Leonard claimed he had given Brown only a small sample of hashish rather than the "brick" that he originally stated that he had given to Brown. Moreover, according to the government, it was determined at the proffer session that Leonard had breached his cooperation agreement by informing Brown that he had been arrested and was cooperating with the government. As a result, in December of 1991, Corngold informed defense counsel that Leonard was not being truthful and, therefore, that the government would not execute the draft plea agreement.

### 4. Prior Proceedings and Sentencing

As a result of the agreement's breakdown, Leonard did not enter a guilty plea, and, on March 9, 1992, moved to enforce the plea agreement and to force the government to make a motion under section 5K1.1 of the guidelines. As part of this motion, Leonard submitted an affidavit ("the March 9, 1992 affidavit") in which he averred that Brown had never finally agreed to participate in the drug transactions. Instead, Leonard claimed in his affidavit that, although Brown initially showed interest in the transaction, he later became wary and expressed the belief that

the government was setting Leonard up. In fact, according to the affidavit, Brown eventually refused to take part in the transaction, and "was leaving the New York area." The district court denied Leonard's motion on the ground that it was premature because Leonard had not yet pleaded guilty. *See United States v. Leonard,* 817 F.Supp. 286, 305 (E.D.N.Y.1992).

On October 21, 1993, Leonard pleaded guilty to conspiring to distribute hashish but reserved the right to move to enforce the prior cooperation agreement. Prior to sentencing, he again moved to compel the government to make a motion pursuant to U.S.S.G. § 5K1.1. Leonard also objected to the recommendation in his presentence report that he receive a two-level, rather than a three-level, reduction in his offense level for acceptance of responsibility. *See* U.S.S.G. § 3E1.1. Section 3E1.1(b)(1) permits a defendant to receive a three-level reduction where, *inter alia,* he "timely provid[es] complete information to the government concerning his own involvement in the offense," and Leonard contended that he had done so.

In justifying its refusal to make a motion pursuant to section 5K1.1, the government contended that no binding plea agreement existed, and that even if there were a plea agreement, Leonard had breached it by (1) interfering with its prosecution of Donald Brown and (2) altering the story that he gave the government at the time of his arrest. The government supported the latter point by contrasting the written statement signed by Leonard on the night of his arrest with representations made by him in the October, 1991 proffer session and in the March 9, 1992 affidavit. The government provided the same justifications for its opposition to the three-level reduction for acceptance of responsibility.

In response to the government's allegation that Leonard interfered with the prosecution of Brown, Leonard contended that he had been told by government agents to contact Brown and to tell Brown to bring himself in. In response to the claim that he had changed his story concerning Brown's involvement, Leonard proffered a Report of Investigation ("ROI"). This document, prepared by Agent

Kaladi over two weeks after Leonard's arrest, contained notes of the statements made by Leonard on the night of his arrest. The ROI reflected statements made by Leonard that were not contained in his written statement, including some that were consistent with Leonard's later accounts. Relying on this document, Leonard argued that he had not changed his story, and that the inconsistencies relied upon by the government were not inconsistencies at all.

After reading the ROI, the district court stated that its decision would "not be influenced by a review of [the ROI]" and that the court did not "consider" it. The court took this position despite its recognition that "some of the points that defense counsel made [with respect to the ROI] are valid." The court denied Leonard's motion to compel the government to make a 5K1.1 motion, having found that "there [was] a major inconsistency between the thrust of the September '91 statement and the [March 9, 1992] affidavit," in that the former essentially inculpated Brown, but that the latter essentially exculpated him. Moreover, the court found that Leonard had breached a condition of the agreement, namely that Leonard not contact Brown or indicate that he was cooperating with the government. Finally, the district court noted that even if a government agent had advised Leonard to contact Brown, other circumstances supported the conclusion that the government's subsequent refusal to honor the plea agreement would not have amounted to bad faith. The district court also denied Leonard's request for the three-level reduction for acceptance of responsibility under section 3E1.1. The court again relied upon the alleged inconsistencies in Leonard's accounts, and concluded that he was not entitled to the three-level reduction because he had not been completely truthful regarding his co-conspirators' involvement in the conspiracy. Leonard appeals.

## DISCUSSION

### 1. *5K1.1 Motion*

■ Leonard's first contention relates to the government's alleged breach of the plea agreement in failing to make a motion under

U.S.S.G. § 5K1.1. Section 5K1.1 provides that: "Upon motion of the government stating that the defendant has provided substantial assistance in the investigation or prosecution of another person who has committed an offense, the court may depart from the guidelines." This guideline gives the government the power, not the duty, to file such a motion when it has determined that a defendant has substantially assisted, *Wade v. United States*, 504 U.S. 181, 184–85, 112 S.Ct. 1840, 1843, 118 L.Ed.2d 524 (1992), and judicial review of the prosecutor's decision whether to make a motion pursuant to section 5K1.1 is narrowly circumscribed. In the absence of a plea agreement, a court may review the prosecutor's decision whether to file a 5K1.1 motion only to determine whether it was based on an unconstitutional motive. *Id.* at 184–87, 112 S.Ct. at 1843–44.

■ However, where a plea agreement provides that the government will file a 5K1.1 motion if it determines that the defendant has provided substantial assistance, a court's review of the government's decision not to file a 5K1.1 motion is more searching. In such a case, "we may review [the agreement] . . . to see if the government has lived up to its end of the bargain." *United States v. Knights*, 968 F.2d 1483, 1486 (2d Cir.1992); *see also United States v. Rexach*, 896 F.2d 710, 713–14 (2d Cir.), *cert. denied*, 498 U.S. 969, 111 S.Ct. 433, 112 L.Ed.2d 417 (1990). We do so upon the principle that "'when a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be part of the inducement or consideration, such promise must be fulfilled.'" *Knights*, 968 F.2d at 1486 (quoting *Santobello v. New York*, 404 U.S. 257, 262, 92 S.Ct. 495, 499, 30 L.Ed.2d 427 (1971)). However, a court may review the government's treatment of a plea agreement like the one at issue here only to determine whether it has acted in "good faith." *Knights*, 968 F.2d at 1486–87; *Rexach*, 896 F.2d at 712–14.

■ We conclude that a remand is required so that the district court may hold an evidentiary hearing to determine whether the government acted in good faith. As an initial matter, we reject the government's contention that there was no plea agreement between the parties. Leonard orally agreed in September of 1991 that he would aid the government in its prosecution of other drug traffickers. Relying on the government's assurances, he provided assistance over a period of approximately two months that led to the arrests of three drug traffickers. Moreover, during the period of his assistance, the government indicated to Leonard that it was satisfied with his cooperation, and sent him a written agreement providing that the government would make a 5K1.1 motion in the event that the government "determine[d] that [Leonard] ha[d] . . . provided substantial assistance to law enforcement authorities and otherwise complied with the terms of th[e] agreement." Both Leonard and his attorney signed the agreement, and the agreement was returned to the government. Finally, in mid-November of 1991, AUSA Corngold assured Leonard's attorney that Leonard's upcoming indictment would be of no real consequence because Leonard was obligated to plead to the charge specified in the agreement. Under these circumstances, the government's assertion that there was no agreement is without foundation.

■ Having concluded that there was a plea agreement, we address Leonard's contention that the district court, in determining whether the government acted in good faith, abused its discretion by failing to consider significant evidence and by failing to take important testimony. While we have outlined the circumstances under which a hearing will be granted to a defendant who alleges that the government acted in bad faith, *see, e.g., Knights*, 968 F.2d at 1487, we have not specified the extent of the required hearing, noting in *Knights* that "whether it be merely oral argument or should include a formal evidentiary hearing is a matter that lies within the sound discretion of the district court." *Id.* At a minimum, however, the district court should consider any evidence with a significant degree of probative value, and should rest its findings on evidence that provides a basis for this court's review. In light of these requirements, we conclude that the district court should have conducted a broader inquiry into the government's refusal to make a 5K1.1 motion.

In response to Leonard's claim that the government acted in bad faith in refusing to make a 5K1.1 motion, the government pro-

vided two justifications for its failure to perform. First, it contended that Leonard had breached the agreement by informing Brown of his cooperation. Second, the government contended that Leonard changed his initial description of Brown's involvement in the drug trafficking conspiracy. These justifications were supported in large part by: (1) unsworn statements regarding the instructions given to Leonard and regarding statements made by Leonard at the October 1991 proffer session and (2) the March 9, 1992 affidavit, which was prepared three months after the government decided not to make the 5K1.1 motion. In response, Leonard argued that he had been instructed to contact Brown and referred to the ROI, which suggested that his story had not changed in the manner alleged by the government. The district court's failure to resolve the disparate contentions implicated in the "change of story" and "contact with Brown" issues requires a remand.

The district court specifically stated that it did not consider the ROI made by Agent Kaladi on October 1, 1991. That document contained information bearing directly on whether Leonard had changed his story. For example, the government argued that, before the October 1991 proffer session, Leonard had not suggested that Brown was tentative about the drug transaction, or that Brown was wary that the transaction might be a "sting." The ROI, however, reflects that Leonard stated on the night of his arrest that "BROWN had warned him (LEONARD) ... that the deal might be a government sting, and that BROWN was waiting for the first deal to be successfully completed." Given the ROI's obvious materiality, there was no justification for the court's failure to consider it.

In addition, the district court ought to have taken testimony to establish what instructions Leonard was given with respect to Donald Brown. Contrary to the district court's view, the government's refusal to make the 5K1.1 motion on the basis of Leonard's post-arrest contact with Brown would have amounted to bad faith if Leonard had been instructed to contact Brown. *See Knights,* 968 F.2d at 1488 (in refusing to make 5K1.1 motion, government may not rely on circumstances of which it was aware at time of

agreement as a basis for its refusal). The district court should conduct a hearing to determine precisely what was said to Leonard by way of instructions relating to Brown, and what Leonard understood; the district court will determine on this basis whether the government could in good faith withhold the motion by reason of Leonard's contact with Brown.

Finally, the district court should establish what transpired at the proffer session of October 1992. No record has been produced reflecting the events of that meeting, yet the government relies heavily on alleged statements made by Leonard at the meeting in justifying its decision not to make the motion. We note that Agent Kaladi, an agent who was present on the night of Leonard's arrest and who drafted the ROI, also was at the meeting. His testimony obviously would be useful in determining what transpired at the proffer session, and in determining the true extent of any inconsistencies in Leonard's accounts of the session. We therefore remand so that the district court can make findings in accordance with the foregoing.

### 2. Acceptance of Responsibility

██ The district court also erred in denying Leonard the three-level guideline reduction available under U.S.S.G. § 3E1.1. Under that section, where a defendant "clearly demonstrates acceptance of responsibility for his offense," the defendant is entitled to a two-level reduction in his offense level. A three-level reduction is available to a defendant who, in addition to clearly demonstrating his acceptance of responsibility, "assist[s] authorities in the investigation or prosecution of *his own misconduct* " by "timely providing complete information to the government concerning *his own involvement* in the offense." *See id.* § 3E1.1(b)(1) (emphasis supplied). Here, the district judge found that Leonard initially had assisted authorities by providing complete information about his own involvement but nevertheless concluded that Leonard was not entitled to the third point. In reaching this conclusion, the district court reasoned that "[i]t would seem to create a strange precedent if a defendant, in admitting his own involvement in a conspiracy, can misrepresent the involvement of others and still be entitled to an additional point."

We reject this approach. Section 3E1.1(b)(1) refers only to the defendant's "own misconduct" and "own involvement," and a defendant has satisfied the requirements for an adjustment under that section when he has described his own involvement in the crime. *Cf. United States v. McKinney*, 15 F.3d 849, 854 (9th Cir.1994) ("[Section 3E1.1] focuses on the defendant's sincere remorse for his own misconduct, not his assistance to authorities in incriminating others."), *supplemented*, 17 F.3d 397 (9th Cir. 1994). Once it is determined that a defendant has completely and truthfully disclosed his criminal conduct to the government, the inquiry with respect to section 3E1.1(b)(1) is complete.

## CONCLUSION

For the foregoing reasons, we reverse so much of the judgment as fails to provide a three-level reduction for acceptance of responsibility, and we remand to the district court for an evidentiary hearing to be held in accordance with this opinion and for resentencing.