### UNITED STATES of America, Plaintiff,

v.

### Edward Lee HARRIS, Defendant.

### Nos. 91–CR–256L, 92–CR–225L, 97–CV–6145L.

United States District Court, W.D. New York.

July 27, 2001.

Robert Napier, Napier & Napier, Rochester, NY, Alan Dexter Bowman, Newark, NJ, for Edward Lee Harris.

Edward Lee Harris, Bradford, PA, pro se.

Christopher V. Taffe, Rochester, NY, for United States.

## DECISION AND ORDER

LARIMER, Chief Judge.

### BACKGROUND

Defendant, Edward Lee Harris ("Harris"), was originally sentenced on May 7, 1993, to 240 months imprisonment on his guilty plea to Counts 1 and 9 of the indictment. Harris had pleaded guilty during his trial for cocaine conspiracy pursuant to a written plea agreement ("Agreement"). Harris was resentenced on October 7, 1998, as a result of matters raised in his petition for habeas corpus relief pursuant to 28 U.S.C. § 2255. On that day, Harris received the same sentence of imprisonment (240 months), and he timely appealed the Judgment and Commitment to the Second Circuit Court of Appeals. On April 12, 2000, the Court of Appeals affirmed Harris's conviction but remanded for resentencing. (*United States v. Harris*, 209 F.3d 156). The case is now before me for sentencing *de novo*.

After an amended presentence report was prepared and distributed to the parties, Harris moved, in the alternative, to withdraw his guilty plea and/or to compel the Government to comply with the terms of the Agreement and file a motion for departure based on his cooperation with the Government subsequent to entry of the plea.

The Court heard argument on Harris's motion to withdraw the plea and also held an evidentiary hearing on that part of the motion seeking specific performance by the Government concerning the filing of a departure motion.

### MOTION TO WITHDRAW THE GUILTY PLEA

Harris claims that the Government acted in bad faith at his original sentencing in 1993 when it declined to make a departure motion at his sentencing. Harris claims that he cooperated with the Government, under the terms of the Agreement, but that the Government failed to follow through and move for a departure and that it did so in bad faith.

As a remedy for this defalcation, Harris seeks to either withdraw his guilty plea or compel the Government to do what it should have done—move for departure. Harris does not claim that there is any other basis to withdraw his guilty plea except for the Government's failure to abide by the Agreement. Under these circumstances, there is no basis to vacate the plea.

■ If in fact the Government has acted in bad faith, the remedy is not to vacate the plea but to enforce the agreement, as contemplated by the parties. At oral argument on the motions, Harris's counsel recognized that vacating the plea was not the sole remedy for breach of the Agreement due to the Government's bad faith. Depending on the facts and circumstances, enforcing the agreement is usually the more practical and appropriate remedy.

■ "A defendant has no absolute right to withdraw his plea of guilty," even prior to sentence. *United States v. Williams*, 23 F.3d 629, 634 (2d Cir.), *cert. denied*, 513 U.S. 1045, 115 S.Ct. 641, 130 L.Ed.2d 547 (1994). *See also United States v. Reyes*, 13 F.3d 638, 640 (2d Cir.1994).

Under Rule 32(d), prior to sentencing, court may permit a defendant to withdraw his plea "upon a showing by the defendant of any fair and just reason." "Whether the movant has asserted his legal innocence is an important factor to be weighed, as is the reason why the defenses were not put forward at the time of the original pleading." Notes to 1983 amendment (citing *United States v. Needles*, 472 F.2d 652 (2d Cir.1973)) (other citation omitted). "The amount of time which has passed between the plea and the motion must also be taken into account." *Id.* The longer it took the movant to seek withdrawal, the less likely his reasons will justify permitting him to withdraw the plea. *Id.* Courts have also considered whether the defendant could have presented the grounds for withdrawal earlier, the defendant's nature and background, and his prior experience with the criminal justice system. *United States v. Bashara*, 27 F.3d 1174, 1181 (6th Cir.1994), *cert. denied*, 513 U.S. 1115, 115 S.Ct. 909, 130 L.Ed.2d 791 (1995).

 Prejudice to the Government is another factor that may be considered, although the Government has no burden to show prejudice where the defendant has not shown sufficient grounds for permitting withdrawal. *United States v. Gonzalez*, 970 F.2d 1095, 1100 (2d Cir.1992); *United States v. Saft*, 558 F.2d 1073 (2d Cir.1977). Possible reasons for prejudice include loss of evidence or witnesses, or the fact that codefendants have already been tried. 1983 Amendment Notes (citing *United States v. Lombardozzi*, 436 F.2d 878 (2d Cir.) (other defendants had already been tried), *cert. denied*, 402 United States 908 (1971)). The defendant must satisfy the court that his reasons "are not outweighed by any prejudice to the government." *United States v. Vega*, 11 F.3d 309, 313 (2d Cir.1993).

 Harris has not demonstrated a good and just reason to withdraw his guilty plea. The plea was entered over eight years ago. There is no suggestion that Harris was not fully apprised of the consequences of pleading guilty, including the mandatory 20–year minimum term of imprisonment. The colloquy between the Court and Harris was detailed and clear and Harris has not suggested otherwise. Harris has never claimed legal innocence concerning the charges against him nor has he justified the delay occurring after the plea and sentence before he moved to vacate the plea. The lengthy delay in moving to withdraw the plea is sufficient reason by itself to deny the requested relief.

Furthermore, the Government has demonstrated significant prejudice should the motion to vacate be granted now. All of Harris's codefendants have either pleaded guilty or been found guilty after trial. Harris himself pleaded in the middle of his own trial. Over a decade has elapsed since the events occurred that resulted in Harris's indictment. In addition, the cocaine seized as part of the investigation was routinely destroyed pursuant to DEA regulations after the plea and sentencing. It may well be difficult, if not impossible, for the Government to proceed to trial now without the evidence seized during the conspiracy.

After reviewing the record, I conclude that Harris has not carried his burden of demonstrating a "fair and just reason" for allowing him to withdraw his guilty plea. This is so even if Harris prevails on his argument that the Government acted in bad faith in refusing to make a motion for a reduction of the sentence. If it is determined that the Government has acted in bad faith, the remedy is not to vacate the guilty plea but to enforce the Agreement, as contemplated by the parties. Enforcing

the contractual obligations of the parties under such an agreement is the proper and appropriate remedy. *United States v. Knights,* 968 F.2d 1483, 1486 (2d Cir.1992).

## BAD FAITH

Harris pleaded guilty during his trial to Count 1 of the indictment, which charged him with engaging in a criminal enterprise (21 U.S.C. § 848) involving narcotics, and to Count 9, a forfeiture count (21 U.S.C. § 853). He also pleaded guilty to an information charging income tax evasion (26 U.S.C. § 7201).

The plea was entered pursuant to an eleven-page written Agreement. The Agreement recited the minimum and maximum sentences faced by Harris, 240 months to life imprisonment, as well as the applicable Sentencing Guideline range, 210–262 months imprisonment. The tax count provided for a maximum sentence of 60 months imprisonment.

In consideration for Harris's guilty plea, the Government agreed to three items, all of which benefitted Harris. The Government agreed to recommend to the Court that Harris receive the lowest possible sentence on Count 1, the statutory minimum of 240 months. In addition, the Government agreed to recommend that the sentence on the tax count run concurrently with the 240–month term on Count 1. At sentencing, the Government did make those recommendations to the Court and sentence was imposed accordingly.

The third item placed in the Agreement in consideration for Harris's guilty plea was the provision for cooperation by Harris, which carried with it the potential for a reduction of the sentence below the 240–month statutory minimum. Harris testified at the hearing on the motion that inclusion of the cooperation provision in the Agreement was very important to him. Both he and the prosecutor testified that the provision was put in the Agreement at Harris's request, so that he could assist the Government and thereby obtain a departure motion and seek a reduction from the 240–month minimum sentence.

The essential terms relating to cooperation are set forth in the Agreement at ¶ ¶ 14 and 16, set out here:

14. The defendant will cooperate with the government by providing complete and truthful information regarding his knowledge of any and all criminal activity, whether undertaken by himself or others, in any way involving or related to the unlawful possession, transportation or distribution of controlled substances. The defendant's cooperation shall also include submitting to interviews by government attorneys and agents, as well as testifying truthfully and completely before grand juries and at such pre-trial and trial proceedings as the government shall deem necessary.

16. At sentencing, should the government determine that, pursuant to this agreement, the defendant has provided substantial assistance in the investigation or prosecution of other persons who have committed offenses, the government will move the Court to depart downward from the Guidelines as provided for in Guideline Section 5K1.1. The defendant understands that the decision to make such a motion is within the sole discretion of the government and that the decision to grant such a motion, and the extent of any downward departure, is a matter solely within the discretion of the Court.

Harris claims that the Government acted in bad faith in refusing to make a motion at sentencing or at any time during the year after sentencing (Fed.R.Crim.P. 35[b]) to reflect Harris's cooperation. Harris claims that he did provide truthful

information about his source of cocaine in New York City as well as information concerning misfeasance by employees at the Rochester Police Department. Harris claims that the DEA agents involved with him ignored his cooperation and the information that he presented to them and affirmatively thwarted his efforts to bring his cooperation to fruition.

At issue here is the extent to which prosecutors can refuse to move for departure under circumstances where it is uncontroverted that the defendant did cooperate with authorities to some degree. Also at issue is the extent to which the Government can thwart the defendant's efforts by ignoring his leads and by acting in a manner that made successful prosecution of others virtually impossible.

In opposing Harris's motion, the Government relies on paragraph 16 of the Agreement. The language there, which is fairly typical for such agreements, vests "sole discretion" in the Government for making departure motions. The Government now asserts that it was not satisfied with Harris's cooperation and therefore declined to move for a departure.

■ "Although federal prosecutors have considerable discretionary control over whether to move, under § 5K1.1, for a downward departure by reason of cooperation, that discretion is by no means unlimited." *United States v. Brechner,* 99 F.3d 96, 99 (2d Cir.1996). For example, "even defendants who have no cooperation agreements are entitled to assurance that the government's motion is not withheld for some unconstitutional reason." *Id.* (citing *Wade v. United States,* 504 U.S. 181, 185–86, 112 S.Ct. 1840, 118 L.Ed.2d 524 (1992)).

■ "[W]here a plea agreement provides that the government will file a 5K1.1 motion if it determines that the defendant has provided substantial assistance, a

court's review of the government's decision not to file a 5K1.1 motion is more searching." *United States v. Leonard,* 50 F.3d 1152, 1157 (2d Cir.1995). Where there is an agreement, the court "may review it . . . to see if the government has lived up to its end of the bargain." *Knights,* 968 F.2d at 1486; *accord United States v. Fernandez,* 127 F.3d 277, 286 (2d Cir.1997). The court will ."inquire also whether the government acted fairly and in good faith." *Brechner,* 99 F.3d at 99 (citing *United States v. Resto,* 74 F.3d 22, 26 (2d Cir. 1996)).

■ Thus, "where the explicit terms of a cooperation agreement leave the acceptance of the defendant's performance to the sole discretion of the prosecutor, that discretion is limited by the requirement that it be exercised fairly and in good faith." *United States v. Khan,* 920 F.2d 1100, 1105 (2d Cir.1990), *cert. denied,* 499 U.S. 969, 111 S.Ct. 1606, 113 L.Ed.2d 669 (1991).

■ That is in accordance with the general principle that plea agreements and cooperation agreements "may usefully be interpreted with principles borrowed from the law of contract." *Khan,* 920 F.2d at 1105; *United States v. Rexach,* 896 F.2d 710, 713–14 (2d Cir.) ("Cooperation agreements, like plea bargains, are interpreted according to principles of contract law"), *cert. denied,* 498 U.S. 969, 111 S.Ct. 433, 112 L.Ed.2d 417 (1990). Because "[t]here is . . . an implied obligation of good faith and fair dealing in every contract, . . . the prosecution's determination that it is dissatisfied with the defendant's performance under the cooperation agreement . . . may not be reached dishonestly or in bad faith." *Khan,* 920 F.2d at 1105; *see also Rexach,* 896 F.2d at 714 ("A prosecutor's determination of dissatisfaction . . . cannot be made invidiously or in bad faith").

For several reasons, on the particular facts of this case, I believe that the Government acted in bad faith in refusing to make the requisite motion for departure under 5K1.1 of the Guidelines and under the statute, 18 U.S.C. § 3553(e). I believe that the facts demonstrate that Harris did cooperate, consistent with the terms of the Agreement. The facts also demonstrate that the Government ignored his cooperation and, in fact, acted in a manner that suggests that the Government had no real interest in Harris's cooperation. The Government by its lack of action virtually assured that Harris's efforts would fail.

The starting point for discussion is the Agreement itself. The Agreement was a contract and set forth what was expected of Harris concerning cooperation. Paragraph 14 of the Agreement required Harris to do three things: first, he was required to provide "complete and truthful information" regarding his knowledge of criminal activity, including distribution of narcotics. He was also required to submit to interviews and to testify truthfully before the grand jury or at trial. There were no other specific requirements concerning Harris's cooperation. Specifically, there was no requirement that Harris must engage in proactive conduct concerning narcotics activity. At the hearing, Scott Green, Esq., the Assistant United States Attorney who executed the Agreement on behalf of the Government, conceded that there was no contractual "requirement" that Harris engage in such activity, although he acknowledged that other agreements that he was familiar with had such a requirement.

So, as to two of the three contractual requirements—submit to interviews and testify—there is no evidence that Harris failed to do all that was required. There is no evidence that Harris ever failed to submit to interviews with Government agents

or that he refused to testify before the grand jury or at trial. In fact, it was conceded that Harris was never asked to testify in any proceeding.

The third item required by the terms of the Agreement was that Harris provide complete and truthful information regarding his knowledge of narcotics distribution. The Government now claims that its decision not to move for departure in 1993 was based on Harris's failure to provide "all information relating to his narcotics distribution activities." Affidavit of Special Agent Matthew G. Barnes, sworn to February 16, 2001, ¶ 4. At other times, however, the Government has claimed that no departure motion was made because Harris did not provide substantial proactive cooperation. Affidavit of Special Agent Matthew G. Barnes, sworn to January 19, 2001, ¶¶ 14 and 15. For the reasons discussed herein, both justifications are suspect.

Harris, Special Agent Barnes, and the former prosecutor Green testified at the hearing on the motion. What emerges from that hearing is a picture of Government agents who seemingly had little interest in pursuing the proactive leads developed by Harris. In fact, the evidence is that it was the agents, not Harris, who, at least in part, made it impossible for Harris to ensnare Harris's source of supply in New York City.

Harris testified in some detail about his efforts to do more than what was required by the Agreement, specifically to set up his source of cocaine in New York City. In many significant respects, Agent Barnes corroborated Harris's version of what happened. Harris first met formally with the agents on October 16, 1992, about four weeks after entry of his guilty plea. The co-defendant, Delaine Gipson, was also interviewed. Harris claimed that he answered all of Barnes's questions, and he

specifically identified the source of his cocaine in New York City as "Tito."

Harris told the agents that his source worked out of Manny's Jewelry Store, 55 West 47th Street, Booth 32–33, and he provided the source's telephone number. Barnes's DEA 6 Report (Ex. 3) of that interview memorializes in detail Harris's disclosure and the references to the name, place of employment and telephone number of Harris's source. There was apparently some confusion over the name, because Harris referred to the source as Tito but on other occasions he had referenced him as "Billy."

Barnes testified that after this conversation with Harris on October 16, he attempted to identify "Manny" without success. There was no request by Barnes at that time that Harris engage in any proactive efforts concerning his source, but he did tell Harris that he would "keep in touch" and that the agents would probably try to "get" the source, Billy.

In spite of that promise, nothing happened for a month or so. In early December, after Harris had repeatedly contacted Barnes, Barnes directed Harris and Gipson to travel together to New York City to find out more information about their source. Barnes sent the two alone, without providing any type of surveillance to help identify the person Harris claimed was his source. In retrospect, this seems unusual on Barnes's part. If he truly sought to identify the source, it would seem imperative to have government agents monitor Harris's meetings, if possible. This procedure was apparently not suggested by Barnes. Rather, Harris and Gipson went to New York City alone.

At the hearing, Barnes explained this activity by claiming that agents from Rochester were not sent because New York City was "out of his territory." In cross-examination, however, Barnes conceded that DEA agents from Rochester had traveled to Florida during the investigation of Harris and Gipson in an effort to discover Gipson's source of cocaine. Why Barnes did not send similar agents to New York City to attempt to provide surveillance and identify Harris's source was not adequately explained at the hearing.

In any event, Harris and Gipson, who had both been released pending sentencing, did travel to New York City and reported back to Barnes that they had arranged to purchased 5 kilograms of cocaine from their source. Harris explained that it had been their routine practice to bring money to New York City for the source, who would then leave with the money and return a short while later with the cocaine. Barnes was not pleased with this news however, because the arrangement required the Government to "front" the purchase price, something Barnes was unwilling to do. In spite of that, Harris agreed to attempt to change the procedure with the source. Later, he arranged for the source to call him on December 17, 1992, at a telephone number in the DEA Office in Rochester, so that the call could be recorded and traced. Harris and Barnes both testified about such an arrangement. Unfortunately, the source did not call at the appointed hour. Harris pleaded with the agents to wait and be patient because the source was sometimes tardy, but they refused to do so. Barnes testified that when the source failed to call, he determined that that was the end of the matter. Barnes admitted that he never again attempted to arrange a controlled telephone call from the source, and it is evident that he took virtually no interest thereafter in attempting to finalize a sale from Harris's source.

Harris had a further conversation with the source, which he reported to Barnes. Apparently he was capable of doing a 2 kilogram sale. At about this time, though, Barnes advised Harris that the DEA in New York City was "not interested" in working the case unless the quantity of cocaine involved was at least 5 kilograms.

This 5 kilogram minimum was a new requirement placed on Harris's cooperation. Even though the "ante" had been raised by the DEA, Harris persisted. Once again, Harris agreed to go to New York City to attempt to arrange a larger sale. Barnes authorized the trip but, once again, provided no surveillance or any other assistance to attempt to positively identify the source.

Harris had many conversations with his source but could not get Barnes interested in pursing the matter. Harris testified that he telephoned Barnes repeatedly, to no avail. Finally, in early January 1993, Harris began to tape the conversations with his source, and he sent copies of each conversation to Barnes. There were approximately 19 such telephone calls from January to April 1993 which were passed on to Barnes and were admitted as exhibits at the hearing.

Barnes did not dispute receiving these tapes and reviewing them. Harris claimed that Barnes was uncooperative and routinely neglected to return Harris's telephone calls about these matters. Eventually, in February 1993, Harris advised Barnes that he had made arrangements for a 5 kilogram deal, as required by the DEA, and that the Government need not front any money. Harris testified that, to his dismay, Barnes never acted on the information and the deal fell through. Barnes testified about the same event and he essentially corroborated Harris's version. Barnes admitted that he learned from Harris that a 5 kilogram deal had

been arranged. Barnes had received a tape of the conversation arranging for the purchase. Barnes acknowledged that there was a rather short ten-day window required by the seller if the sale was to occur. Barnes admitted that he never got back to Harris concerning this deal, and never authorized the purchase. He never contacted the DEA in New York City about the potential 5 kilogram deal. Barnes admitted this inaction even though he acknowledged that he had received a call from a detective in the New York City Police Department expressing interest in working a deal with Harris.

Barnes claimed that the deal had a low priority with him once the DEA in New York indicated it was only interested in deals larger than 5 kilograms. Barnes conceded that Harris could not complete any deal without Barnes's approval and Barnes never did approve any deal. Although at the hearing Barnes claimed that the deal was a low priority item, he admitted on cross-examination that during his five-year career with the DEA, he had never worked on a deal as large as a 5 kilogram one.

After the time to complete the 5 kilogram deal had elapsed, Harris's source apparently had difficulty obtaining drugs and Harris could never arrange another opportunity to purchase the drugs.

During the investigation of Harris and Gipson, Barnes monitored intercepted conversations between Harris and his source. At the hearing on this motion, Barnes admitted that he had no reason to believe that the "source" identified by Harris during his cooperation activities was different from the "source" contacted by Harris prior to his arrest.

Barnes further testified that he had utilized cooperating witnesses before and that the objective in such situations was to

"climb the ladder" and identify and prosecute those who were more involved in the drug trade, especially suppliers of illegal drugs. In spite of Barnes's testimony about his normal objectives concerning the use of cooperating witnesses, his actions concerning Harris and Harris's source demonstrate no such effort.

Harris supplied information and continually worked on his supplier to arrange a substantial drug deal. Barnes and others at the DEA did virtually nothing to follow up and pursue that opportunity to identify, arrest and prosecute Harris's source. This source appears to have been a significant dealer of drugs. It is hard to understand Barnes's disinterest. Barnes's DEA 6 Report of March 18, 1993 (Ex. 4) states that Harris claimed receiving 5 kilograms a month from his source for two years. Harris claimed to have distributed 100 kilograms of cocaine and made $300,000 to $400,000 profit.

There is another aspect of Harris's cooperation which was ignored as well. During the original investigation of Harris, Gipson and others, it appeared that Harris was somehow able to identify the unmarked police vehicles that were conducting surveillance of him. The suspicion was that Harris, armed with the license plate numbers, was able to obtain information from someone connected with the Rochester Police Department about ownership of the vehicles observed by Harris near his residence and place of business. This ability by Harris was discovered when the agents monitored Harris's telephone conversations pursuant to the wiretap orders.

After Harris and the others had been arrested, this continued to be a source of concern to the agents and officials at the Rochester Police Department. On the scheduled sentencing date, March 18, 1993, Harris moved to adjourn the sentencing, without objection from the Government, because of his cooperation relating to this leak at the Rochester Police Department concerning the vehicle information. It is clear from the colloquy among the Court, counsel and the defendants, that the purpose for the adjournment was to allow further cooperation by Harris.

It appears from all accounts that Harris *did* cooperate regarding this matter, and his cooperation enabled the Rochester Police Department to identify the source of the leak. Barnes met with Harris on March 18, 1993—the date of sentencing—and in his report (Exhibit 4) he confirms that Harris identified a woman working for the Parking Violations Bureau of the Rochester Police Department as his source for obtaining vehicle information. At the hearing on the motion, Barnes conceded that in March 1993, Harris did cooperate with them to identify his source for obtaining the vehicle information. Apparently, Harris participated with the police in taped conversations with this source and that work led to the identification of the source and appropriate action was taken. In his testimony, Barnes confirmed that the DEA and the Rochester Police Department were completely satisfied with the result obtained because of the information provided by Harris.

In spite of this activity by Harris and the other efforts he made to arrange a large drug deal with his source, Barnes had no recollection whatsoever of even discussing Harris's cooperative efforts with the prosecutor as sentencing drew near. Green, the prosecutor, also had no recollection of Barnes approaching him before sentencing concerning Harris's cooperation. The prosecutor did recall, however, that he was aware that Harris had contacted his source in New York City and, in fact, the prosecutor recalled talking directly with Harris about those efforts, although the prosecutor was uncertain as to

any of the details. It is evident that the prosecutor left the mechanics of Harris's cooperation efforts to Barnes and other agents with the DEA.

I believe that the facts surrounding Harris's cooperation warrant the conclusion that Harris met his obligations under the Agreement, but that the Government did not. I believe that the Government did act in bad faith in refusing to make any departure motion based on Harris's activities between entry of his plea and sentencing.

 It is true that the Agreement vested discretion in the Government concerning the decision to seek departure. But that discretion is controlled by the nature of the contractual arrangement, the obligations of the contracting parties and, most importantly, the requirement that both parties act in good faith toward each other to bring about the objectives of the Agreement. The Agreement did not give the Government *carte blanche* authority to do whatever it wanted to do. Such an interpretation vitiates rudimentary principles of contract law. By its nature, a contract requires both parties to shoulder certain obligations. Harris pleaded guilty in the middle of his trial. Both he and the prosecutor testified that the cooperation provision was put in the Agreement at Harris's request so that he could attempt to provide cooperation and at least seek to have his sentence reduced by the sentencing judge. The Agreement, as discussed above, required Harris to provide information, submit to interviews, and testify. There was no evidence that he failed to submit to interviews, and he was never asked to testify. The Government now, many years after the fact, seeks to justify its failure to move because defendant failed to provide "all information" available to him. The basis now advanced by the Government for its refusal to move for departure in 1993 was the agent's belief that Harris failed to provide all information to them relative to his narcotics activity. Two Government agents, Agent Barnes and IRS Special Agent James Donovan, submitted virtually identical affidavits in February 2001, prior to the hearing on defendant's motion, stating that it was their "present recollection" that Harris had not provided all relevant information back in 1993, prior to sentencing. There are several problems with this, however. Barnes conceded at the hearing that at the time in question, 1992–1993, he never memorialized any concerns about Harris's disclosures in any DEA report. He also corroborated Harris's testimony that Barnes never told Harris of the Government's dissatisfaction during Harris's many contacts with Barnes. Furthermore, the Assistant United States Attorney handling the case had no recollection of Barnes or any other agent approaching him before sentencing to advise that Harris had failed to live up to the cooperation agreement. Neither the DEA agents nor the prosecutor had any memoranda or notes reflecting Harris's failure to perform.

The truth appears to be that the Government *never* intended from the beginning to work with Harris on his cooperation efforts. The prosecutor unwittingly suggested as much at the hearing when he testified that there was little incentive for the DEA to pursue information about Harris's suppliers when they believed that Harris himself was a significant drug dealer.

 The point is, though, that the Government had a contractual relationship with Harris which required it to act in good faith. If the Government had no interest in Harris's cooperation, they should not have entered into the agreement that they did. This contractual relationship required that the Government not

take action that would prevent Harris from fulfilling his obligations. The proof here demonstrates that the Government did just that.

■ In all contracts, there is an implied covenant of good faith and fair dealing. An aspect of that requirement is that a party may not act in such a manner as to provide the other party from performing his obligations under the contract. "Every contract contains an implied condition that one party will not prevent performance by the other party." *Van–Go Transport Co. v. New York City Bd. of Educ.*, 53 F.Supp.2d 278, 298 (E.D.N.Y.1999); *see also, Dunnigan v. Metropolitan Life Ins. Co.*, 99 F.Supp.2d 307, 324 (S.D.N.Y.2000); *Eastern Shore Markets v. J.D. Assoc. Ltd.*, 213 F.3d 175, 182–183 (4th Cir.2000). The Government by action and inaction frustrated Harris's efforts to cooperate and provide assistance.

The Agreement did not, by its terms, require Harris to engage in proactive work, but he was willing to do so. The facts demonstrate that the Government gave him no support whatsoever in his efforts and affirmatively refused to work with him in February of 1993 after Harris had arranged what appeared to be a significant sale of cocaine.

I find that after the source failed to telephone the DEA Office as scheduled on December 17, 1992, Agent Barnes stopped pursuing the lead given to him by Harris. After that time, virtually no effort was expended to identify the source in New York City, even when it appeared that a major transaction could have been arranged in February 1993. Harris was on his own but, of course, he could not finalize the transaction until he had Barnes's approval to go ahead with the deal. Barnes admitted that he never contacted his counterparts in New York City to make the

necessary preparations for consummation of the sale.

Even Harris's cooperation relating to the leak at the Rochester Police Department was never brought to the sentencing court's attention and was not the basis for any departure motion. That inquiry was very important at the time to the Rochester Police Department, and Harris delivered the identity of his source with favorable results. It is hard to understand why those efforts alone did not warrant a motion to depart to some degree.

This is not a case where the Government was simply dissatisfied with what Harris produced. In this case, the Government affirmatively and actively thwarted Harris's efforts to fulfill his obligations under the Agreement. To act in such a manner constitutes bad faith and under such circumstances the Government should be compelled to live up to its obligations under the Agreement.

■ Because I find that the Government breached the Agreement, the remedy is to compel specific performance. In this case, specific performance is the filing of a motion for a departure. In the context of this case, I treat the matter as if the Government had made the appropriate departure motion under 5K1.1 of the Sentencing Guidelines and under the statute, 18 U.S.C. § 3553(e). Such a motion provides the Court, in its discretion, with the authority to grant a departure from the 20 year statutory minimum sentence.

## CONCLUSION

Defendant's motion for leave to withdraw the guilty plea is denied. Defendant's alternative motion to compel specific performance by the Government of its obligations under the plea agreement is granted and the Court deems the Govern-

ment to have made the requisite departure motion.

Sentencing is scheduled for August 21, 2001 at 11:00 a.m.

Any submissions relative to sentencing, including objections to the presentence report, or statements relating to whether the Court should grant departure, and the extent of such a departure, must be filed with the Court one week prior to sentencing.

IT IS SO ORDERED.